**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Marvin MATTSON and Edward F. Greene, Defendants-Appellants.**

**Nos. 81–1302, 81–1303.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1981.

Decided Feb. 23, 1982.

* The Honorable Robert D. Morgan, Chief District Judge of the Central District of Illinois, is sitting by designation.

Carl P. Clavelli, Sherman C. Magidson, Chicago, Ill., for defendants-appellants.

Patrick Deadly, Asst. U. S. Atty., Dan K. Webb-U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and BROWN, Senior District Judge.[*]

WESLEY E. BROWN, Senior District Judge.

These appeals by defendants Mattson and Greene arise from their convictions under Count III of a three-count indictment for conspiracy to violate the Hobbs Act, 18 U.S.C.A. § 1951. Count I of the indictment charged the defendants with a direct violation of the Act by extorting $3,000 from Donald S. Anderson under color of official right; Count II charged the defendants with aiding and abetting the offense in Count I; and Count III alleged that they conspired to violate the Act. Mattson and Greene waived their right to a jury trial, and on January 15, 1981, the district court entered its Memorandum Opinion and Order finding defendants not guilty on Counts I and II, but finding them guilty of conspiracy as charged in Count III of the indictment. The relevant facts unfolded at trial virtually without dispute or contradiction, and the only questions on appeal are whether those facts are sufficient to support the convictions for conspiracy to violate the Hobbs Act.

In late 1977 or early 1978, while Donald Anderson was employed by Playboy Enterprises as chief electrician, he was asked by his superiors to obtain a supervising electrician's license. Playboy was initiating an austerity program at that time, and it was thought that money could be saved if some of the major electrical renovation and repairs in the Playboy Building were per-

formed internally, rather than hiring Playboy's outside electrical contractor, Commercial Lighting, to do the work. In order for Playboy to do electrical work internally, it was necessary for someone on Playboy's staff to be licensed to apply for work permits issued by the City of Chicago, and this was the reason for the request by Anderson's superiors. Anderson agreed to try to become a licensed electrician, and after first mistakenly applying for an electrical contractor's license, he did apply to take the City of Chicago Supervising Electrician's Licensing Examination on January 12, 1978. Anderson feared, however, that his application would not be successful because Harry Hayman, the city electrical inspector in whose district the Playboy Building was located, would try to block it. Concluding that he needed an "edge," Anderson spoke to George Mpistolarides, a Playboy Building engineer and a precinct captain in the Chicago Democratic organization, who had once told Anderson he knew some people who could help him obtain an electrician's license.

Mpistolarides put Anderson in contact with defendant Marvin Mattson, a used car salesman who was also a Democratic precinct captain. Anderson and Mattson then met at the Playboy Club in early February, 1978, at which time Mattson told Anderson that "he had some connections at City Hall" and he would see what he could do to "help." Within the week following this meeting, Mattson had lunch with defendant Edward Greene. Greene was also a Democratic precinct captain, and at the time was employed by the Clerk of the Circuit Court of Cook County. Mattson asked Greene if he could assist in getting Anderson's license, and Greene agreed to do so. Greene first contacted a man he knew only as "Joe" in the City Planning Department. "Joe" said he would talk to someone and contact Greene in a couple of days. After this conversation, Greene remembered that he knew Mildred Manglardi, who worked directly in the Chicago Bureau of Electrical Inspection (BEI). Greene telephoned Mattson with this information, and Mattson in turn called Anderson to tell him a contact had been made. Mattson and Anderson met again at the Playboy Club, within a week of their first meeting there, and Mattson told Anderson that it would cost $3,000 to ensure that he would get his license. Approximately three or four weeks later, Mattson again called Anderson to tell him that arrangements had been made, and that Anderson should get the money together. Anderson withdrew $1,000 from his checking and savings accounts and raised another $2,000 by taking out a personal loan.

In early May, 1978, Anderson brought the $3,000 to work and met Mattson at the Playboy Club; the two then took a cab to City Hall, where Anderson met Greene for the first time. All three men went upstairs to the BEI office and then went behind the counter in that office to Manglardi's desk. Greene explained to Manglardi that Anderson wanted an electrical supervisor's license, and Manglardi stated that the BEI was under a lot of pressure from the FBI, indicating either that no license was obtainable or that the cost of the license was very high. No money was given to Manglardi at that time, and no deal was struck. Anderson concluded from the conversation that neither of the defendants had any influence in the BEI. Anderson, Mattson, and Greene left the BEI office and returned to the ground floor. Greene left immediately, but Mattson assured Anderson that the license could still be obtained some other way, and asked him for the $3,000. Anderson gave the money to Mattson.

Not long after the visit to the BEI, Greene received a telephone call from a man who identified himself as "Joe." There was no evidence that the caller was either the same "Joe" who worked at the City Planning Department, or that he worked at the BEI, although Greene assumed the latter. Joe told Greene that the price of help on the examination would be $6,000, but after Greene called Mattson and was told that Anderson could only afford $3,000, Joe agreed to the lower figure. During the next week or so, a date was set for the payoff, Mattson gave Greene $1,500 of the $3,000 Anderson had given him, and Greene gave this $1,500 to an unidentified person, explaining that the remaining

$1,500 would be paid when Anderson took the examination.

On July 12, 1978, Anderson took what he believed was a supervising electrician's examination. After he had taken this examination, Anderson was approached first by Mattson and then by Greene for an additional $2,000. Greene told Anderson that he would never get a license unless he came up with the additional money. Anderson never made another payment to either of the defendants after the original $3,000 at City Hall. After several weeks had passed, and Anderson had heard nothing about his test results, he called the BEI and eventually reached a Mr. Hogan, the BEI's chief electrical inspector. Hogan told Anderson that he had taken the wrong examination, namely the electrical contractor's test instead of the supervising electrician's test, and that he would have to take the examination again. The record is ambiguous as to which examination Anderson actually took. In any case, Anderson never received a supervising electrician's license, and despite his request to both Mattson and Greene to return the $3,000 he had paid, that amount was never returned to him.

██ The first of two issues raised by the defendants on appeal is whether the evidence failed to establish the necessary nexus between extortion and interstate commerce in this case. The Hobbs Act, 18 U.S.C.A. § 1951, provides in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not

more than $10,000 or imprisoned not more than twenty years or both.

(b) As used in this section—

\* \* \* \* \* \*

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means . . . all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; . . . .

The reading of the statute makes clear that it is not every act of extortion which is punishable thereunder; only the obstruction, delay, or affectation of (in this case) interstate commerce by means of extortion gives federal courts jurisdiction. We recognize, of course, that the broad language of the Act manifests ". . . a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion . . . ." *Stirone v. United States*, 361 U.S. 212, at 215, 80 S.Ct. 270, at 272, 4 L.Ed.2d 252, at 255 (1960). The statute is to be given an expansive construction, but neither the constitutional limits on the power of the national government, nor the jurisdictional requirement of some connection with interstate commerce may be ignored. *United States v. Staszcuk*, 517 F.2d 53 (7th Cir. 1975) (en banc), cert. denied 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

██ The cases in this Circuit concerning Hobbs Act prosecutions can be seen as falling into two groups. Cases comprising the first category involve what may be termed a direct[1] connection between extortion and interstate commerce or articles moving in interstate commerce.[2] It is not

---

1. As used here, "direct" and "indirect" have reference to when the effect on interstate commerce occurs, and whether there is any intervening or intermediate effect. Where extortion directly affects interstate commerce, the extortion itself delays the transportation of building materials across state lines, for example; there is no intervening step nor intermediate effect. An indirect effect, such as in depletion-of-assets cases discussed below, affects the assets of

a business first, and through their reduction affects interstate commerce.

2. *United States v. Kramer*, 355 F.2d 891 (7th Cir. 1966), cert. granted in part and denied in part, 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed.2d 396 (1966); *United States v. Pranno*, 385 F.2d 387 (7th Cir. 1967), cert. denied 390 U.S. 944 & 972, 88 S.Ct. 1028 & 1094, 19 L.Ed.2d 1132 & 1183 (1968); *United States v. Amabile*, 395 F.2d 47 (7th Cir. 1968), vacated on other

only actual effects on interstate commerce which are proscribed by the Hobbs Act, but also threatened or potential effects which never materialize because extortionate demands are met. *Staszcuk, supra.* Even a beneficial effect on interstate commerce, e.g. facilitating the flow of building materials across state lines, is within the prohibition of the statute. *United States v. Kuta,* 518 F.2d 947 (7th Cir. 1975), cert. denied 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975).

■ The second line of cases has established another ground for the assertion of Hobbs Act jurisdiction, namely the depletion-of-assets indirect effect on interstate commerce.[3]

> Under the depletion of assets theory, commerce is affected when *an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets* depleted through extortion, thereby curtailing *the victim's* potential as a purchaser of such goods.

*United States v. Elders,* 569 F.2d 1020 (7th Cir. 1978) at 1025, citing *DeMet, supra* in footnote 3, (emphasis added). A de minimus effect on interstate commerce is sufficient for federal jurisdiction, *DeMet,* but "... the effect still must be more than a speculative, attenuated 'one step removed' kind of effect." *Elders,* id. There must be a realistic probability of a nexus, in each case, between the extortionate conduct and interstate commerce before federal jurisdiction will lie. *Elders* and *Staszcuk, supra.*

■ In the case at bar, we are unable to find the required connection between the extortion and an effect on interstate commerce. There was no possibility of a direct effect on interstate commerce, because Anderson's payment of $3,000 for an electrician's license neither actually nor potentially affected the purchase of electrical supplies from outside Illinois for use in electrical repairs in the Playboy Building. Whether Playboy's own staff did the work, or Commercial Lighting was hired, the supplies would still have to be purchased outside Illinois by Playboy or Commercial Lighting. Neither of these enterprises were victims of the extortion.

Neither can the depletion-of-assets theory serve to bring this case within the Hobbs Act. It is true that in giving the Hobbs Act the broad interpretation due it, this Circuit and others have held the indirect effects caused by depletion of assets to be jurisdictionally sufficient. That is, we have found in the statute a basis for tracing the effects of extortion through the financial condition of a single business entity. We continue to adhere to the extension of federal jurisdiction in such cases. But there is a difference between an expansive reading and one which ignores or nullifies the interstate commerce language. In each of the cases cited in footnote 3, the extorted payment came from a business enterprise which was the victim and engaged in interstate commerce, or whose reserves for purchasing goods in interstate commerce were directly and immediately diminished due to the extortion. In the case before us, it was only Anderson's personal assets which were depleted by the $3,000 payment: The record clearly established that Playboy never reimbursed Anderson for the extorted sum. We would have a different case if Playboy, a business, had been the victim of the extor-

grounds, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297 (1969); *United States v. Irali,* 503 F.2d 1295 (7th Cir. 1974), cert. denied 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975); *United States v. Staszcuk, supra; United States v. Kuta,* 518 F.2d 947 (7th Cir. 1975), cert. denied 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975).

**3.** *United States v. DeMet,* 486 F.2d 816 (7th Cir. 1973), cert. denied 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); *United States v. Crowley,* 504 F.2d 992 (7th Cir. 1974); *United States v. Braasch,* 505 F.2d 139 (7th Cir. 1974),

cert. denied 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975); *United States v. Craig,* 573 F.2d 513 (7th Cir. 1978), cert. denied 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978); *United States v. Elders,* 569 F.2d 1020 (7th Cir. 1978); *United States v. Blakey,* 607 F.2d 779 (7th Cir. 1979); *United States v. Price,* 617 F.2d 455 (7th Cir. 1979); *United States v. Glynn,* 627 F.2d 39 (7th Cir. 1980); *United States v. Hedman,* 630 F.2d 1184 (7th Cir. 1980), cert. denied 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *United States v. Rindone,* 631 F.2d 491 (7th Cir. 1980).

tion instead of Anderson. But Anderson himself certainly was not conducting a business engaged in, or purchasing items from, interstate commerce. The victim in this case was an individual who had no connection with interstate commerce at all, but whose only connection was with a business which was engaged in interstate commerce. Thus, to find an effect on interstate commerce, we would be required not only to consider indirect effects within a single business entity, but also effects arising from the business entity's relationship with an employee not engaged in interstate commerce.

The government argues that we should consider the fact that both Playboy and Commercial Lighting are businesses which customarily purchase items in interstate commerce. It is claimed that jurisdiction is present because if Anderson had gotten his license, the financial condition of Playboy would have improved, and Commercial Lighting would in turn have lost business as Playboy's electrical contractor.

This argument, however, overlooks the point that the alleged conspiracy to extract money from Anderson did not in and of itself affect interstate commerce. One of the essential elements of proof required to establish a violation of the Hobbs Act is, of course, the effect or potential effect on interstate commerce. The trial judge determined both Playboy and Commercial Lighting were engaged in interstate commerce and we concur. We are concerned, however, with Anderson's lack of involvement in interstate commerce. The government was required to prove beyond a reasonable doubt that the natural consequences of the acts alleged in the indictment would delay, interrupt or otherwise affect interstate commerce. This proof in our opinion was insufficient.

The Hobbs Act requires that interstate commerce be affected *by extortion*, not by a result of extortion; there must be a nexus between extortion and interstate commerce before federal jurisdiction is present. The only nexus here was between the extortion of Anderson, and his position as an employee of Playboy. Adding a second connection, between Playboy's potentially increased assets and interstate commerce, does not satisfy the jurisdictional requirement. Such a nexus, drawn by adding an additional party and more "tying together" to the well-established depletion-of-assets analysis, is too indirect.

We have found no case which extends Hobbs Act jurisdiction so far as to encompass the facts of this case. If a sufficient nexus were found here, we are unable to conceive of an extortionate transaction which would not be punishable under the Hobbs Act. To so hold would mean that the extortion of money from any individual in our society could arguably affect interstate commerce eventually. Simply stated, the extortion did not affect Playboy, nor interstate commerce through Playboy, but Anderson. Any effect the extortion had beyond the personal effect on Anderson was too attenuated and was removed one step too far to come within the Hobbs Act. Due to our holding that lack of federal jurisdiction will not permit the convictions to stand, the second issue raised by defendants in their appeals is moot.

The judgments and convictions appealed from are REVERSED.