UNITED STATES of America,
Plaintiff–Appellee,

v.

Bruce N. WILKINSON, Defendant–
Appellant.

No. 93–5757.

United States Court of Appeals,
Sixth Circuit.

Argued Mar. 8, 1994.

Decided June 2, 1994.

Stephen B. Pence, Asst. U.S. Atty., Office of the U.S. Atty., Louisville, KY, Edwin J. Walbourn, III (briefed), Office of the U.S. Atty., Covington, KY, Bruce E. Reinhart (argued), U.S. Dept. of Justice, Public Integrity Section, Washington, DC, for plaintiff–appellee.

Carter G. Phillips (argued and briefed), Mark D. Hopson, Sidley and Austin, Washington, DC, George Salem, Jr., Louisville, KY, Frank E. Haddad, Jr., Louisville, KY, for defendant–appellant.

Before: NELSON and SILER, Circuit Judges; and WELLFORD, Senior Circuit Judge.

WELLFORD, Senior Circuit Judge.

During the late 1980's, the Kentucky legislature passed legislation allowing for inter-track wagering ("ITW"). Under this legislation, if no horse racing were running at a particular track, it could still operate and compete with other tracks by taking bets through ITW. This law, however, provided that in small communities only tracks featur-

ing thoroughbred horse racing could simulcast such races. At this time, Ellis Park and Riverside Downs, both horse racing tracks, were situated in the small community of Henderson, Kentucky. Riverside Downs, a harness racing enterprise, could not compete with the thoroughbred race track, Ellis Park, under the ITW system. Riverside Downs, therefore, began both a legal effort and a lobbying effort to change the existing Kentucky law.

M. L. Vaughn, owner of Riverside Downs, hired John Hall, a former Kentucky state senator, as a lobbyist on its behalf. After lobbying activity, the Kentucky General Assembly amended the ITW law to provide that thoroughbred and harness racing tracks in larger communities should split ITW simulcast dates on a 60/40 basis. This amendment, however, was of no practical help to Riverside Downs located in Henderson. In the fall of 1990, Vaughn became privy to information that certain Kentucky legislators were soliciting bribes in exchange for their assistance in removing the provision of the law favoring Ellis Park. After discussing this problem, Vaughn and one of his employees, Chris Koumas, decided to contact the FBI. Thereafter, Koumas began to work for the FBI on their ensuing investigation into this matter. After confronting Hall with evidence of his participation in such activities in related matters,[1] Hall agreed to cooperate with this ongoing investigation.

Vaughn instituted a state court action seeking to strike down a provision of the ITW law granting exclusive ITW rights to his competitor, Ellis Park. He was successful in state court, but prior to this time the ITW law provided that the two Kentucky racing commissions would meet in the fall of each year and agree on the allocation of ITW dates between competing tracks for the following year. The ITW law also required the Kentucky Governor to appoint an arbitrator to resolve any impasse between the two com-

missions. In October, 1991, the commissions were at an impasse regarding the allocation of ITW dates between Riverside Downs and Ellis Park. The commissions, therefore, applied to the Governor for the appointment of an arbitrator.

On or before November 6, 1991, the defendant, Bruce Wilkinson, learned of this decision to appoint an arbitrator. Wilkinson, an employee in the office of his uncle, Governor Wallace Wilkinson, then compiled a list of people from which the Governor might select an arbitrator. Within ten days, Governor Wilkinson appointed Linda Thomas, law partner of one of the attorneys on the original list of proposed arbitrators. The government asserts that the defendant's criminal activities began at this juncture. The government alleges that in October and November of 1991, the defendant and Jay Spurrier,[2] a lobbyist, had agreed that the defendant would ensure that an arbitrator would be appointed and that Riverside Downs would receive a favorable ruling. In return, the defendant would receive $20,000. After learning that the Governor planned to appoint an arbitrator, the defendant allegedly told Spurrier that he secured the appointment of an arbitrator, ensuring a favorable outcome for Riverside Downs. Spurrier allegedly then agreed to the $20,000 proposed arrangement, but the defendant would not receive any money until after the arbitrator ruled.

Spurrier told Bill McBee[3] about this proposed arrangement and pay-off. Spurrier and McBee then relayed this information to Koumas in Lexington, Kentucky. Shortly thereafter Riverside Downs agreed to pay for the appointment of an arbitrator with expectation of a favorable decision. Also at this meeting, Spurrier told Koumas and McBee that he would be attending the Breeders' Cup race the next day and would be sitting with the person who would appoint

---

1. Hall pled guilty on May 5, 1992 to violating the Hobbs Act and Travel Act in another case.

2. Spurrier subsequently pled guilty to a Hobbs Act and wire fraud charge.

3. McBee had been a Kentucky representative before he became a lobbyist. McBee pled guilty on June 25, 1992 to three Hobbs Act charges arising from the charged conspiracy with Spurrier and also the defendant.

the arbitrator. Spurrier sat with the defendant at the Breeders' Cup.

Wilkinson was indicted for conspiring to commit extortion under color of right in violation of the Hobbs Act, 18 U.S.C. § 1951, and for engaging in a mail fraud scheme in violation of 18 U.S.C. §§ 1341 and 1346. Wilkinson was acquitted on the mail fraud count, but convicted on the Hobbs Act count. Wilkinson appeals his conviction challenging, among other things, the jury instructions and the admission of a surveillance tape.

## I. JURY INSTRUCTION ON EFFECT ON INTERSTATE COMMERCE

We review a challenged jury instruction under "a plain error" standard when the defendant fails to object to the instruction at trial. *United States v. Young,* 470 U.S. 1, 15–16, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985); Fed.R.Crim.P. 52(b).[4] An instruction is not plainly erroneous unless there was "an egregious error, one that directly leads to a miscarriage of justice." *United States v. Busacca,* 863 F.2d 433, 435 (6th Cir.1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1640, 104 L.Ed.2d 156 (1989). In any event, this court must evaluate claimed error in light of the entire trial record. *Young,* 470 U.S. at 16, 105 S.Ct. at 1046.

Where a jury instruction is given in the alternative, and any one of the alternative instructions is in error, the verdict must be assumed to have "rested exclusively on the insufficient ground." *Zant v. Stephens,* 462 U.S. 862, 881, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983). Failure to define accurately the elements of an offense, moreover, may constitute plain error. Fed.R.Crim.P. 52(b); *United States v. Bryant,* 461 F.2d 912, 921 (6th Cir.1972) (holding that failure to give accurate instructions on elements of an offense is "grave error," "not excused or waived by failure to request a proper instruction"). Under the Hobbs Act, the basis of the indictment, the government must establish that there was extortion and that the extortion obstructed, delayed or affected interstate commerce. *Stirone v. United States,* 361 U.S. 212, 218–19, 80 S.Ct. 270, 273–74, 4 L.Ed.2d 252 (1960).

The district court gave three alternative instructions, pursuant to which the jury might find the alleged extortion had the requisite effect on interstate commerce as suggested by the government:

(1) The government asserts that the alleged conspiracy had the potential to diminish the assets of Riverside Downs....

(2) The government also asserts that the alleged conspiracy actually affected commerce through the making of interstate telephone calls....

(3) Finally, the government asserts that had the conspiracy succeeded, it would have resulted in the flow of goods and services in interstate commerce....

If you find unanimously that the government has proven *any one* of these beyond a reasonable doubt, then the necessary effect on interstate commerce has been shown.

(emphasis added).

That third part of the instruction is at issue on this appeal. The defendant argues that this last part of the instruction is erroneous because it permits the jury to find an effect on interstate commerce based upon the result or consequences of the extortion rather than the alleged extortion. The defendant argues that such construction of the Hobbs Act is wrong, being contrary to congressional intent, the rules of statutory construction, and established precedent. The defense relies specifically on *United States v. Mattson,* 671 F.2d 1020 (7th Cir.1982).

In *Mattson,* the victim of the extortion and scheme was an employee of Playboy Enterprises. The defendants forced the victim to pay out of his own personal funds in order to obtain an electrician's license. Playboy had encouraged the employee/victim to obtain the license so that the employee could undertake certain repairs and improvements and save Playboy the cost of obtaining outside contractors. Rejecting a jury instruction offered by the government that would allow the jury to find that success in the extortion and scheme would result in a requisite effect on interstate commerce, *Mattson* held that the benefit to Playboy resulted not from the extortion

---

**4.** There is no evidence in the record indicating the defendant's objection to the jury instructions.

itself, but from the beneficial result of the extortion. *Id.* at 1025. The court then concluded that such an instruction was beyond the reach of the Hobbs Act, which requires that interstate commerce be effected by extortion, not by the result of extortion. *Id.* The Seventh Circuit accordingly refused to expand the Hobbs Act to all instances in which the success of the scheme to extort had some indirect effect on interstate commerce. *Id.*

The government, in response, contends that *Mattson* is distinguishable, involving a victim that was an individual who was not personally engaged in interstate commerce. The government notes that the Seventh Circuit concluded that the holding would have been different if a business entity were the victim. *See Mattson,* 671 F.2d at 1024–25. On the other hand, the government argues that the challenged jury instruction in this case is consistent with our holding in *United States v. Peete,* 919 F.2d 1168, 1174 (6th Cir.1990). In *Peete,* we held that federal jurisdiction existed if the victim of attempted extortion was engaged in interstate commerce, and the attempted extortion had "the realistic probability" of affecting interstate commerce. *Peete,* 919 F.2d at 1174–75. Like the real estate developer in *Peete,* who would have purchased supplies and materials that passed into interstate commerce, Riverside Downs would have purchased goods and supplies outside of Kentucky. We are guided by *Peete* and, therefore, overrule the defendant's contentions in this regard. *See also United States v. Boulahanis,* 677 F.2d 586, 589 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982).

## II. *THE "BRIEFCASE TAPE"*

Within the major issue of this case, the defendant raises several sub-issues. First, he argues that the district court should have suppressed the tape obtained as a result of a surveillance device placed in Spurrier's briefcase, because the government failed to comply with the requirements of 18 U.S.C. § 2518(8)(a). The defendant next argues that the court should have suppressed the "briefcase tape" because it was inaudible. Finally, in a somewhat related vein, the defendant argues that the district court erred

by providing the jury a transcript of the tape without deleting many inaudible or undecipherable portions therein.

Under Title III of the Omnibus Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, electronic surveillance may only be conducted pursuant to court order and in a manner consistent with the requirements of Title III. *See United States v. Ojeda Rios,* 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990). When the government conducts electronic surveillance, such as the briefcase recording in this case, § 2518(8)(a) requires that "the contents of any . . . communication intercepted by any means authorized by [Title III] shall, if possible, be recorded on tape or wire or other comparable device." 18 U.S.C. § 2518(8)(a). Furthermore, these types of recordings shall be done in such a way as will protect the recording from "doctoring" or alterations. *Id.* Finally, in order to ensure the integrity of the recording, § 2518(8)(a) also requires that immediately upon the expiration of the period of the order, or extension thereof, such recordings shall be made available to the judge issuing such surveillance order and sealed under his direction. *Id.* Failure "immediately" to seal a recording pursuant to § 2518(8)(a) can result in the exclusion of the evidence. *Ojeda Rios,* 495 U.S. at 260, 110 S.Ct. at 1848; 18 U.S.C. § 2518(8)(a) (stating a compliance with sealing requirements or a satisfactory explanation for noncompliance shall be a prerequisite for the use or disclosure of the contents of any reported communication or evidence derived therefrom).

In an order dated January 7, 1992, the district court authorized electronic surveillance, which resulted in the "briefcase tape." The district court's interception order provided that it would expire on the earliest of three dates: (1) the last date on which the government intercepted conversations with the briefcase recording device; (2) fifteen days measured from the first interception; or (3) twenty-five days from entry of the order. The order also stated that interception of oral communications must terminate upon the attainment of the authorized objectives, not to exceed fifteen days measured from the day on which the investigative law enforcement officers first began to conduct

an interception of this order, or ten days after the order was entered, whichever was the earlier time.

The only communications intercepted by the briefcase recorder occurred on January 7, 1992. The defendant argues that the authorization accordingly expired on that same date. The defendant also argues that the government failed to have the "briefcase tape" judicially sealed until January 23, 1992, sixteen days after the only interception, and hence sixteen days after the expiration of the authorization. Thus he maintains that, as a result, the "briefcase tape" was not sealed immediately upon the expiration of the order, as required under the Act.

The government argues that if the period specified in the order expired on January 22, 1992, the tape was "immediately" sealed on January 23, 1992. If, however, we determine that the period of the order expired on January 7, 1992, the government concedes that the tape may not have been timely sealed under the Act. The government, nevertheless, argues that prejudicial error did not occur, in any event.

The government urges adoption of a rule that surveillance tapes need not be sealed until the authorization order expires—that is, the last day before an extension of the order would be required for further surveillance. The district court apparently held that because the interception order expired on January 22, 1992, fifteen days after the United States first began intercepting communications, the government timely sealed the January 7 tape on January 23, 1992.

We find no authority on this precise issue in this court. We must first determine whether the immediate sealing requirement under the Act and under these circumstances required the government to seal the tape on January 7, 1992, or "immediately" after the interception.

The government contends that it was not required to seal the tape recording until the fifteen day period in the interception authorization order had expired, despite the fact that the United States did not intercept other conversations during the ensuing fifteen day period. It urges this court to adopt a rule that surveillance tapes need not be

sealed until the authorization order expires, that is, the last day before an extension of the order would be required for further surveillance. The district court was persuaded to hold that the sealing January 23, 1992, was timely.

The defendant unsuccessfully argued that since the last actual interception occurred January 7, the sealing of the tape on January 23 did not meet the statutory mandate. The defendant cites *United States v. Ojeda Rios*, 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990), in his brief in support of his argument for suppression of the tape based on untimely sealing. *Ojeda Rios* held that the sealing of the tape was to be done "immediately" as specified by 18 U.S.C. § 2518, "because it limits the Government's opportunity to alter the recordings." *Id.* at 263, 110 S.Ct. at 1849. If not done "immediately upon the expiration of the period of the order [of interception]," the Court stated that the reason for delay or "excuse ... advanced by the Government [must be] ... objectively reasonable." *Id.* at 266, 110 S.Ct. at 1851. (Or that its interpretation of the time of expiration, even if incorrect, "was objectively reasonable at the time.") Requiring a *"correct interpretation"* was "too strict a standard." *Id.* at 267, 110 S.Ct. at 1851 (emphasis added).

The concurrence of Justices O'Connor and Blackmun indicated further that "a 'satisfactory explanation' within the meaning of 18 U.S.C. § 2518(8)(a) cannot merely be a reasonable excuse for the delay; it also must reflect the actual reason for the delay ... based on findings made and evidence presented in the district court." There is no reflection in the record as to the basis for the delay in causing the "briefcase tape" to be sealed except the United States Attorney's belief that "our 15–day clock start[ed] running either on the day we started recepting [sic] or 10 days after the order was signed ... the Judge's order says it doesn't expire for 15 days, and on Day 16, we sealed the tapes with Judge Bertelsman." J/A 60. The judge's ruling was: "I think that the tapes were properly sealed" without any recitation of authority or further specifications. In its written order, the district court concluded that "[b]oth the admission of tape recordings

at trial and a determination of the accuracy of a transcript are within the discretion of this court. *United States v. Robinson,* 707 F.2d 872, 876 (6th Cir.1983)." [5]

In accordance with *Ojeda Rios,* then, we must determine whether the January 7 tape was turned over "immediately" within the meaning of the statute, and, if not, whether the delay was unreasonable, and whether the explanation of the prosecution for the delay was "objectively reasonable."

Upon remand of the delay in sealing issue in *Ojeda Rios* to the Second Circuit, that court in *United States v. Maldonado–Rivera,* 922 F.2d 934, 948–53 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 and *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1026 (1991), found that "the government's explanations for the 15– to 19–day intervals were satisfactory [and] did not warrant suppression of the tapes." *Id.* at 952, 953. The reasons given by the government "for these delays were based on misunderstandings," but they were held to be "genuine" and " 'satisfactory' within the meaning of Title III." *Id.* at 951. The erroneous misunderstanding about the legal requirements were somewhat similar in *Maldonado–Rivera* to those of the prosecutor in the instant case. "The supervising attorney believed he did not have to seek a judicial sealing of the tapes until 'there was a meaningful hiatus in the investigation as a whole,' i.e. until not only the original order but also all extensions of that order." *Id.* at 950. Even a "mistaken view of the law" might still be "satisfactory" or "reasonable" in accordance with *Maldonado–Rivera. Id.* at 951. Even a longer delay, again based upon a legal misunderstanding of the sealing requirements that sealing was to occur immediately upon conclusion of the investigation, may be sufficient to withstand a suppression motion if the mistake or misunderstanding were reasonable or justified after a careful analysis of the explanation given, according to *United States v. Vastola,* 989 F.2d 1318, 1326–27 (3d Cir.1993).[6]

Another circuit court, following the rationale of *Ojeda Rios* recently analyzed reasons

given by the government for a delay of 14 days in sealing and set out a number of factors to consider before finally finding that the district court's denial of the motion to suppress the surveillance tapes was not in error. *See United States v. Pedroni,* 958 F.2d 262, 265 (9th Cir.1992). See also *United States v. Suarez,* 906 F.2d 977, 982 (4th Cir.1990), *cert. denied* 498 U.S. 1070, 111 S.Ct. 790, 112 L.Ed.2d 852 (1991) stating:

> But the government also must demonstrate "good cause" for the failure. *United ed States v. Ojeda Rios,* 495 U.S. at 264, 110 S.Ct. at 1850. Among the factors relevant in determining whether the government has presented a satisfactory explanation for its failure to seal are the length of any delay before sealing, the care taken in handling the recordings, prejudice to the defendants, any tactical advantage accruing to the government, and whether deliberate or gross dereliction of duty or honest mistake caused the failure to file. *See United States v. Mora,* 821 F.2d [860] at 868–69 [(1st Cir. 1987)]; *United States v. Diana,* 605 F.2d [1307] at 1314–16 [(4th Cir.1979)]; *see also United States v. Ojeda Rios,* 495 U.S. at 266, 110 S.Ct. at 1851 (government's "objectively reasonable" misapprehension of statute's requirements is satisfactory explanation for delay in sealing.)

■ The case discussed hereinabove points out the importance of particular findings and conclusions regarding the circumstances of, and the reasons given for, delay for any period beyond the immediate requirement of sealing under the Wiretap or Omnibus Crime Control Acts. The district court in this case made no such analysis and did not set out clearly its reasons for finding that the sealing in the instant case was timely or objectively reasonable within the meaning of the law. We are troubled, moreover, by the lack of clarity, the gaps, and problems inherent in the tape itself, as well as the

---

**5.** *Robinson* is inapposite inasmuch as it discusses the admissibility of partially inaudible tapes and the "use of transcripts" of such tapes, not a delay in sealing.

**6.** *Vastola* was decided after the Supreme Court vacated an earlier opinion and "remanded for consideration in light of *United States v. Ojeda Rios,* 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990)." *United States v. Vastola,* 497 U.S. 1001, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990).

purported transcript thereof. Under all these circumstances, we would find it very helpful for appellate review purposes for the district court to set out specifically the reasons for finding that the sealing was timely and its version of the particular "authentic, accurate and trustworthy" portions of the tape that deal with the vital meeting between Spurrier and the defendant on January 7, 1992.

Of course, even if the tape itself or the transcripts were legally inadequate or deficient for any reason, it may be that the district court could find that there was sufficient and adequate other corroborative evidence that might support the verdict rendered. All of these considerations need be reviewed and taken into account by the district court in setting out, upon remand, its findings and conclusions on the difficult issues concerning the tape in question.

Accordingly, we **REMAND,** for the reasons stated, the issues related to the "briefcase tape" of January 7, 1992, for further consideration, findings and conclusions by the district court.