**Richard H. WAGNER, M.D., Plaintiff,**

v.

**MAGELLAN HEALTH SERVICES, INC., Patricia Penhall, Sean Cull, Ron Gerstein, Dr. Robert Sullivan, Dr. M.J. Werthman, Polly Pope and Dr. Bruce Roberts, Defendants.**

No. 99 C 8235.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 5, 2000.

Peter D. Michling, Weisz & Michling, Woodstock, IL, Michael J. Fleck, Huntley, IL, for Plaintiff.

Mark A. Brand, Dan J. Hofmeister, Jr., Michelle F. Kavoosi, Quarles & Brady LLC, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Not every wrong has a judicial remedy. Dr. Richard Wagner, a psychiatrist, alleges that he was "blacklisted" by Magellan Health Services, Inc. ("Magellan"), a managed care organization or HMO, and several of its present or former employees, the named individual defendants above. He says that Magellan quite unjustifiably decided that he was a nuisance because he insisted on proper care and treatment for patients whom Magellan did not wish to cover, and cut him off. He sued initially for antitrust violations under the Sherman Act, and I granted judgment on the pleadings for the defendants on those claims, *see Wagner v. Magellan Health Services*, 121 F.Supp.2d 673 (N.D.Ill.2000), but I allowed him to file an amended complaint alleging violations of the Racketeer Influ-

enced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), and several Illinois statutes.

The defendants move to dismiss for failure to state a claim, and I grant the motion as to the RICO counts and dismiss the remaining counts for lack of subject matter jurisdiction. Accepting Dr. Wagner's story, as I must for the purposes of this motion, Magellan behaved like the stereotypical HMO, with a beady eye on the bottom line and stony indifference to patient welfare, but the hard fact of the matter is that even if Magellan is a poster child for the social ills of HMOs, Dr. Wagner has not alleged any legal wrong done to him under a federal statute.

## I.

Dr. Wagner is an out-of-network provider for Magellan. He maintains offices in Barrington, Illinois, and has staff privileges at Good Shepherd Hospital ("Good Shepherd") in Barrington. His problems with Magellan began in January 20, 1998, when he admitted a patient in emotional distress to Good Shepherd. Magellan declined to certify the patient for a hospital stay, but Dr. Wagner refused to discharge her. Magellan then denied the patient's benefits coverage, sending a letter to this effect, dated January 21, 1998, and signed by defendant Ron Gerstein, to the patient in the hospital, although Magellan remarked that this form of notification might further upset the patient. Dr. Wagner complained to defendant Robert Sullivan, the regional medical director of Magellan, who in turn stated to Chris Caddy, Good Shepherd's Director of Psychiatric Services, that he would discuss this case and possible cancellation of Magellan's contract with the hospital. Sullivan told Dr. Wagner that the practice of sending such letters to hospitalized patients had been approved by URAC, an accrediting agency for managed care companies, although this was not true.

On November 4, 1998, another emergency patient with no out-of-network benefits was admitted while Dr. Wagner was on call at the emergency room. When Magellan was contacted for certification, defendant Patricia Penhall stated that the patient could be attended by "anyone but Wagner," explaining that this prohibition applied to all patients with or without out-of-network benefits. Penhall said that her supervisor, defendant M.J. Werthman, had cleared a directive not to use Dr. Wagner as a provider, and that this had happened with other physicians. Dr. Wagner spoke with defendant Sean Cull, Magellan's director of provider relations, who denied that there was a blacklist, and also told Dr. Wagner that there were no complaints against him. Although Cull told Dr. Wagner that he should be able to see the patient, Magellan directed that the patient be transferred to another hospital despite the fact that medical stability was not established. Cull said this was done at the direction of defendant Bruce Roberts, Magellan's Medical Director, and that Roberts had stated that Dr. Wagner was to be denied even ad hoc authorization to see the patient.

Another Magellan-insured patient was admitted to Good Shepherd on November 5, 1998, while Dr. Wagner was on call, and when Magellan was contacted for certification, Cull told the social worker assigned to the case: "Off the record, anybody but Dr. Wagner.... This comes from the top." On November 23, 1998, a hospital social worker informed Dr. Wagner that Penhall, with the agreement of several unnamed individuals audible over the phone, had attempted to persuade her to have a patient transferred from Good Shepherd without even seeing another physician, although patients could be moved without following proper procedures. On December 15, 1998, Magellan again attempted to get Good Shepherd to deflect patients to bypass Dr. Wagner, but the hospital would not agree to this. Finally, on October 14, 1999, a Magellan-covered patient was admitted to the psychiatric unit, and defendant Polly Pope of Magellan told a social

worker, "I don't think the patient can see Dr. Wagner; we've had a lot of problems with Dr. Wagner." Dr. Wagner alleges that there was no other reason than Magellan's opposition to bar him from seeing the patient.

## II.

A motion to dismiss for failure to state a claim is to be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations' of the complaint." *Cook v. Winfrey*, 141 F.3d 322, 327 (7th Cir.1998). In assessing a motion to dismiss, I "take as true all factual allegations in the plaintiff's pleadings and draw all reasonable inferences in his favor." *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 502 (7th Cir.1998).

The gravamen of Dr. Wagner's federal complaint is that the defendants violated the anti-racketeering laws by interfering with his business. RICO penalizes people who associate with or operate "enterprises" by means of a "pattern of racketeering activity." 18 U.S.C. § 1962(a)–(d). "Racketeering" is defined as any one of a number of predicate criminal offenses, including wire and mail fraud and extortion. 18 U.S.C. § 1961(1). Predicate acts must be "indictable activities." *i.e.*, crimes. *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir.1992). A "pattern" is, roughly, "at least two acts of racketeering activity" committed within ten years. 18 U.S.C. § 1961(5). Finally, section 1964 provides a private cause of action with treble damages. The elements of a civil RICO claim, then, are "(1) a violation of the RICO statute, including proof that the defendant has participated in a pattern of racketeering, and (2) an injury to business or property." *McCool v. Strata Oil Company*, 972 F.2d 1452, 1464 (7th Cir.1992). Dr. Wagner's complaint fails because he

does not succeed in alleging a RICO predicate act, and so there is no pattern of racketeering activity. Therefore I need not consider whether the defendants operated a RICO "enterprise."

### A.

■ Dr. Wagner offers two candidates for predicate acts: extortion and wire fraud.[1] He argues that Magellan committed extortion, a violation of the Hobbs Act, 18 U.S.C. § 1951, because, in the context of the incident of January 20, 1998, Magellan regional director Robert Sullivan told Chris Caddy, Good Shepherd's Director of Psychiatric Services, that he would discuss canceling Magellan's contract with Good Shepherd if, implicitly, Dr. Wagner persisted in making "trouble." However, even accepting that Magellan viewed Dr. Wagner as a "bothersome fly who needed to be swatted down," and that it threatened to cancel its contract in order to pressure the hospital into getting him off the case, although this was medically contraindicated, and even if this would have been a breach of contract had the threat been carried through, it would still not be an indictable offense. Nor does Dr. Wagner cite any authority that even hints that it would be a crime.

■ A violation of the applicable part of the Hobbs Act involves an attempt to obtain money or property of another through wrongful use or threats of force or fear, and that the extortion affected interstate commerce. *United States v. Knox*, 68 F.3d 990, 995–96 (7th Cir.1995); 18 U.S.C. § 1951(b)(2). Fear of economic harm is a basis for a Hobbs Act violation. *See United States v. Sturman*, 49 F.3d 1275, 1281 (7th Cir.1995). Even looking at the matter in the light most favorable to Dr. Wagner, Sullivan's threat was not an attempt to obtain property by raising the fear of economic harm in the specter of contract can-

---

1. The other wrongs that Dr. Wagner alleges under the RICO count include: (1) attempt to interfere with a contractual relation with a hospital and (2) tortious inference with pro-

spective economic advantage. These are torts, not crimes, and so not RICO predicate acts.

cellation, but only an attempt to induce Good Shepherd to remove Dr. Wagner from this patient's case.

Dr. Wagner argues that Magellan would save money by denying the patient's insurance expenses when someone else would have to pay for the patient's treatment, and the threat was therefore an attempt to obtain property from another. I don't think a denial of insurance coverage, however cruelly announced, is extortion merely because someone other than the provider has to pay. Whatever the ethics of the matter, it does not become extortion under the Hobbes Act even if backed up with a threat to cancel an insurance contract to pressure a hospital to remove a physician who refused to discharge a patient, or even to put pressure on the physician himself to discharge the patient. Even if it were extortion, moreover, Dr. Wagner would lack standing to sue on behalf of either Good Shepherd or the patient, the only plausible candidates for persons who would have to pay for noncovered treatment. Dr. Wagner would not have had to pay, and so lacks the requisite "injury in fact" that the Constitution requires for him to bring suit. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ Dr. Wagner also argues that Magellan tried to extort money from him personally by cutting him out of the case and thus denying him payment for providing out-of-network services, but the threat was directed at Good Shepherd, not him. The target of the threat and the person from whom property is to be extorted need not be identical: I may extort money from someone by threatening his children. But Dr. Wagner does not allege any such relation that would make a threat directed at Good Shepherd extortionate with respect to him. He merely worked there. Moreover, Dr. Wagner does not argue that he had any right to fees for treating the patient, so the fees were not his property that might be extorted by threats of contract cancellation directed at Good Shep-

herd. Again, he lacks standing to sue on this theory. Dr. Wagner may be right that Magellan acted like a bunch of shady greedsters indifferent to the serious medical needs of its insureds. But in a capitalist society with private medicine, that was not a crime without specific legislation to the contrary. It was not, at any rate, extortion.

■ And even if it were extortion, the facts alleged here do not show the effect on interstate commerce that is required by the Hobbs Act. *See United States v. Mattson*, 671 F.2d 1020, 1024 (7th Cir.1982). A de minimus effect on interstate commerce will do, but "there must be a realistic probability of a nexus ... between the extortionate conduct and interstate commerce." In *Mattson*, a Chicago man was charged with paying bribes to acquire an electrician's license to work for a contractor serving a publisher, both indisputably involved in interstate commerce. The Seventh Circuit found that the defendant's own "lack of involvement in interstate commerce" meant that, in the circumstances, the required nexus was lacking. Otherwise, "the extortion of money from any individual in our society could arguably affect interstate commerce eventually," and thus expand Hobbs Act liability beyond the statutory and constitutional barriers imposed on the federal courts. *Id.* at 1025. Dr. Wagner does not allege that he was involved in interstate commerce, and even if Magellan and Good Shepherd were, the case appears to be on all fours with *Mattson.*

### B.

■ Dr. Wagner's second candidate for a RICO predicate act is wire fraud. 18 U.S.C. § 1343. The statute forbids the use of the telephone or other modes of transmission by wire for the purpose of executing a "scheme or artifice to defraud." *See United States v. Coffman*, 94 F.3d 330, 332 (7th Cir.1996). The mail and wire fraud statutes broadly apply to any scheme "where in order to get money or

something else of monetizable value from someone[,] you make a statement to him that you know to be false, or a half truth that you know to be misleading, expecting him to act upon it to your benefit and his detriment." *Emery v. American Gen. Fin., Inc.,* 71 F.3d 1343, 1346 (7th Cir. 1995) (civil RICO context). The elements of a wire fraud violation are: (1) participation in a scheme to defraud, (2) intent to defraud, (3) use of wire communications in furtherance of that scheme, *United States v. Lack,* 129 F.3d 403, 405 (7th Cir.1997), and (4) interstate transmission by wire. *Hartz v. Friedman,* 919 F.2d 469, 472 (7th Cir.1990).

Dr. Wagner fails to allege that the wire communications involved were interstate, but there would be no point in allowing him to remedy that pleading defect. There was no scheme to defraud alleged because the statements in question either could not be construed to be attempts to get something of monetary value, or to be made in furtherance of such a scheme, or were not in fact false.

■ First, there is Sullivan's lie, in connection with the January 1998 incident, that the practice of sending letters informing hospitalized psychiatric patients that their insurance coverage had been denied had been approved by URAC, an accrediting agency for HMOs. The false statement bore only on whether it was okay to send such a letter to a patient who was then hospitalized, and not on whether it was okay to exclude Dr. Wagner from treating the patient, which was the supposed scheme. The lie was wholly irrelevant to the purported scheme that Dr. Wagner alleges. It was a threadbare attempt to half-justify a gratuitous cruelty in the face of understandable outrage. ("What kind of outfit would send such a letter to an emergency psychiatric patient in the hospi-

tal?!" "Well, the accrediting agency says it's okay . . .").

■ Second, Dr. Wagner alleges that in November 1998, Penhall, using the telephone, attempted to persuade a social worker to transfer a patient to another hospital in contravention of proper procedures. Magellan may have acted improperly here, but there was no false statement alleged at all.

■ Third, Dr. Wagner refers to a telephone statement that was made in the October 1999 incident, "I don't think the patient can see Dr. Wagner." This is consistent with saying, "Magellan won't allow Dr. Wagner to see the patient," which was true. It did not falsely indicate a different source of his inability to see the patient. But even if false, it was not part of a scheme to defraud because Dr. Wagner had no prior right to the property in question, the monies that the patient or Magellan would have owed for treatment, because he had no prior right to fees for treating the patient. He therefore cannot have been defrauded of those monies by any false statement or omission. They weren't his to start with.[2]

Dr. Wagner thus fails to state a claim for wire fraud, and also violates the pleading requirements of Fed.R.Civ.P. 9(b), that fraud be pleaded with particularity. He responds that he has no more information presently available to him, but says that "it is conceivable" something might turn up in discovery. This is the quintessence of a fishing expedition, and cannot defeat a motion to dismiss.

### III.

Dr. Wagner has now made two tries to remedy Magellan's alleged abuses: his initial antitrust complaint and this civil RICO claim. His real complaint is with the cost-conscious heavy-handedness of the man-

---

2. Dr. Wagner, incidentally, could not argue that the possibility of recovery in his tortious inference claims establishes a right to those fees: not only would that be too speculative, but it would risk raising every business dispute involving two statements made on the interstate wires that might be construed, however ambiguously, as false, into a RICO case.

aged care industry. The "[d]efendants don't like the way [Dr. Wagner] practices, because some of his decisions cost the[m] . . . money," even when in his professional judgement the decisions are medically required. Dr. Wagner says: "Defendants should not be allowed to get away with this behavior." The Seventh Circuit agreed in a related context, holding that patients who were ERISA plan beneficiaries could sue HMOs for denying them necessary medical care for bottom-line reasons, *see Herdrich v. Pegram*, 154 F.3d 362, 371 (7th Cir.1998) (*rev'd by* 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)), but, as the parenthetical indicates, the Supreme Court disagreed. *Pegram*, an ERISA case, does not control here, but it is relevant that the Supreme Court stated that "courts are not in a position to derive [ ] sound legal principles" to resolve complex policy debates, *Pegram*, 120 S.Ct. at 2150, and that in deciding what to do about balancing increasing health costs and adequate patient care, "legislative not judicial solutions are preferable." *Id.* However awful Magellan's behavior, its conduct has not been prohibited under any of the federal statutes Dr. Wagner has invoked. The defendants, for better or worse, are indeed "allowed to get away with this behavior," at least far as Congress has said or Dr. Wagner pleaded. Whether they should be so allowed is not up to me. It is up to Congress.

Dr. Wagner's RICO claim (count I) is DISMISSED for failure to state a claim. I also DISMISS the state law claims in count II–V for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).