[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court for decision is the final portion of defendant Jonathan Oster's ("defendant Oster") motion to suppress electronic wiretap surveillance evidence from his trial upon which this Court previously reserved decision pending an evidentiary hearing. Defendant Oster seeks to suppress the tapes comprising the Sprint 114 and Verizon 115 wiretaps on the grounds that the State violated the sealing and storage provisions of the state and federal wiretap statutes, R.I. Gen. Laws § 12-5.1-8(a) and 18 U.S.C. § 2518(8)(a),[1] by not storing those tapes in a safe-deposit box, as the Presiding Justice had directed, and by allowing the seal on the box containing those tapes, that had been placed on the Box under the direction of the Presiding Justice, to be broken prematurely. Following an evidentiary hearing, and for the reasons set forth in this Decision, this Court grants, in part, defendant Oster's motion to suppress.
 I. PROCEDURAL HISTORY
In a March 10, 2004 decision, this Court denied defendant Oster's motion to suppress electronic wiretap surveillance evidence on all bases except for his claim that the State violated the sealing and storage provisions of the Rhode Island Wiretap Statute, R.I. Gen. Laws § 12-5.1-8(a).[2] Seegenerally State v. Picerno, C.A. No. P1-02-3047B, State v.Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57 (March 10, 2004). As to defendant Oster's sealing and storage claim, this Court found that, while R.I. Gen. Laws § 12-5.1-8(a) does not impose suppression as a remedy for the State's alleged improper storage of the wiretap recordings, the statutory provision could restrict the use of the recordings due to improper sealing.[3] State v. Picerno, C.A. No. P1-02-3047B, State v. Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *93, *95-96, *100 (March 10, 2004). The Court reserved judgment, pending an evidentiary hearing, on whether the State violated the sealing and storage provisions of R.I. Gen. Laws § 12-5.1-8(a) and, if so, whether suppression is warranted for the sealing violation.[4] Id. at *101-02.
The Court held this evidentiary hearing on April 26 and 27 of 2004 ("Evidentiary Hearing"). The State called six witnesses, and defendant Oster examined all of those witnesses through his counsel but called no witnesses to testify on his own behalf. Testifying at the hearing were Investigator Clifford Coutcher ("Coutcher") and Detective Sergeant Brian Casilli ("Casilli") of the Rhode Island State Police Financial Crimes Unit; Alyson Adalio ("Adalio"), Administrative Assistant to the Chief of the Criminal Division for the Department of Attorney General; Marianne DeSimone ("DeSimone"), Chief Paralegal of the Criminal Division; Peter Neronha ("Neronha"), former Assistant Attorney General; and Saray Desnoyers ("Desnoyers"), Paralegal in the Criminal Division of the Department of Attorney General.
At the hearing, the State introduced as exhibits the previously-submitted affidavits of Adalio, DeSimone, and Desnoyers. The State also introduced as exhibits the wiretap applications and orders, along with the transcript of the October 3, 2003 hearing before the Presiding Justice for the unsealing of the wiretap applications, orders, and tapes. Following the Evidentiary Hearing, defendant Oster moved for leave to expand the record of the hearing to include an affidavit of Joseph F. Rodgers, Jr., Presiding Justice of the Superior Court. By stipulation, the parties agreed to augment the record to include the May 13, 2004 affidavit of the Presiding Justice.
 II. BACKGROUND FACTS[5] A. The Intercept Post
On Saturday, February 16, 2002, the Financial Crimes Unit of the Rhode Island State Police ("FCU"), working in conjunction with the Rhode Island Department of Attorney General ("the Department"), terminated the final two wiretaps authorized for this case. This was the FCU's first wiretap investigation. The FCU utilized one wiretap to intercept communications over Robert Picerno's cellular telephone and used the other wiretap to intercept communications over Robert Picerno's home telephone. Those wiretaps are labeled as "Sprint 114" and "Verizon 115," respectively.[6]
At the time the State shut down the wiretaps, Coutcher was operating a facility that the State Police used to intercept communications pursuant to wiretap authorizations. This facility ("intercept post" or "post") was a secure building inside an old National Guard hanger. The State Police constructed the post for the purpose of intercepting communications. Inside the intercept post was a room in which the State Police intercepted, recorded, and temporarily stored recorded communications for ongoing wiretap investigations ("wiretap room"). The wiretap room is somewhat fortified. A padlocked, seven-foot chain-link fence, topped with barbwire, cordoned off the intercept post. Once inside this fence, the outside door to the post was locked and required a key. Inside this outer door was a so-called "bay" area leading to the wiretap room. Access to the wiretap room was controlled by another locked door, which required a separate key. Maintenance personnel could gain access to the bay area but only investigators assigned to the wiretap room had its access key. In addition, other state police personnel had access to the hanger, but only wiretap monitors had access to the intercept post.
At 11:55 a.m. on Saturday, February 16, 2002, Coutcher received orders to shut down the wiretaps. Coutcher shut down the intercepting devices and then emptied all of the previously recorded communications, which were recorded on cassette tapes ("tapes" or "recordings"), out of a metal cabinet inside the wiretap room.[7] Coutcher counted the tapes to ensure that the number of tapes he collected matched the number of tapes in the logs that the monitors had used to document events throughout the wiretaps. He accounted for all of the tapes; thirty-one tapes comprised the Sprint 114 wiretap and forty tapes comprised the Verizon 115 wiretap.
While intercepting communications, the State Police simultaneously recorded the conversations on a separate set of duplicate tapes that it kept for investigatory purposes. SeeState v. Campbell, 528 A.2d 321, 330 (R.I. 1987) (duplicate recordings may be kept for investigatory purposes and need not be sealed pursuant to R.I. Gen. Laws § 12-5.1-8(a)). Detective Casilli testified that one or two of the tapes among the set of duplicate recordings maintained by the State Police were blank for unknown reasons but that all other copies matched the originals. "[S]ome slight technical discrepancies between two simultaneous recordings . . ." are harmless, absent a claim of prejudice, id.; however, where, as here, the discrepancies are inexplicable and extend to the entirety of one or two tapes, the Court must weigh those factors when considering the integrity of the tapes. See infra.
Coutcher next placed the original tapes inside one "banker's box" and transported them to the FCU at State Police Headquarters. At State Police Headquarters, Coutcher did not store the tapes in the State Police evidence room. Rather, he stored the box of original tapes in a locked fireproof cabinet to which only he had access. Coutcher next accessed the tapes to inventory them on the following day, Monday, February 18, 2002. He placed the tapes on a table, counted the tapes, and checked to ensure that each tape was in its correct case. Coutcher determined that he had possession of all of the tapes comprising the Sprint 114 and Verizon 115 wiretaps. Other than keeping count of the tapes, however, no one kept paperwork documenting the custody and transfer of each individual tape.
 B. The Chambers
The next day, Tuesday, February 19, 2002, Coutcher met with Detective Casilli, who was also a detective with the FCU. Detective Casilli's duty was to take possession of the tapes and transport them to the chambers of the Honorable Joseph F. Rodgers, Jr., Presiding Justice of the Rhode Island Superior Court, where the tapes would be sealed. Detective Casilli and Coutcher first counted and organized the tapes. Detective Casilli then transported the tapes to the Superior Court. Once there, Detective Casilli met in chambers with the Presiding Justice, Neronha, and Desnoyers.
At this time, pursuant to R.I. Gen. Laws § 12-5.1-8(a), all of the recordings from the Sprint 114 and Verizon 115 wiretaps that were presented to the Court were sealed under the Presiding Justice's direction. Neither the tapes and their seals nor demonstrative evidence depicting the tapes and their seals were introduced into evidence in the Evidentiary Hearing before this Court. According to the testimony, however, the Presiding Justice had the tapes sealed with white, address-style labels bearing the signature of the Presiding Justice and Neronha. The labels had adhesive on the backside and peeled off of sheets that measured 8½ by 11 inches. The Presiding Justice and Neronha continuously signed labels (without regard to the number of labels that were necessary to seal the cassette tapes) while Desnoyers affixed the signed labels in some fashion to each plastic case that held an individual cassette recording. Detective Casilli may have assisted Desnoyers in affixing the labels.
After all of the tapes were sealed, they were placed in a box ("the Box"), and one of the four parties in attendance — it is not clear who — sealed the Box with a signed label or signed labels. Inexplicably, neither the Box and its seals nor demonstrative evidence depicting the Box and seals were introduced into evidence at the Evidentiary Hearing. The evidence thus is unclear as to the number of labels used to seal the Box; yet it seems that signed labels, which remained unused after sealing the tapes, may have been used in some fashion to seal the Box. Although it is not entirely clear, it seems that all signed labels were used during the sealing ceremony. Additionally, it appears, though again it is unclear, that someone may have sealed the Box with more than just address labels, such as with tape.See infra subheading (II)(D) (quoting observations from the unsealing hearing regarding the Box being taped closed and the difficulty in unsealing a similar box of recordings).
It is also unclear if the Box is the same "banker's box" that Coutcher used when he transported the tapes. The precise nature and description of this Box is unclear as well. It appears that the Box was not conspicuously marked as bearing wiretap evidence; the Box may have been marked with the wiretap authorization number or a telephone number and the date. In addition, no one present at the sealing ceremony is able to recall specific instructions from the Presiding Justice on sealing the Box of recordings. Nonetheless, it is evident that the Box was sealed as part of the evidence sealing process that took place in chambers under the auspices of the Presiding Justice.
The Presiding Justice understood that, once the tapes and the Box were sealed under his direction, the Department would place the Box in a commercial bank vault or safe-deposit box, consistent with the long-standing practice of the Department with respect to the storage of sealed wiretap evidence that had been followed before and during his tenure as Presiding Justice. See
Affidavit of Presiding Justice, Joseph F. Rodgers, Jr. (May 13, 2004). According to the Presiding Justice, this long-standing practice of securing sealed tape recordings in a bank vault or safe-deposit box immediately after their sealing made the issuance of a written custody order in each case unnecessary.Id. He also noted that it is standard practice for the Department to prepare all necessary orders regarding intercepts for his signature. Id.
Neronha believed that the Presiding Justice in fact had issued an order requiring the recordings to be stored in a safe-deposit box, although no signed order was produced. He testified that he did not recall preparing a sealing order but that Stephen Dambruch, a former Assistant Attorney General who worked on this case, may have done so. Desnoyers testified that she was not aware of any judicial or statutory mandate requiring storage in a safe-deposit box but believed it was her office's "common practice" to store such evidence at a bank.
Regardless of whether there was an explicit written or verbal storage order, it is clear based on the testimony adduced at the Evidentiary Hearing that it was the Presiding Justice's understanding and expectation that the sealed wiretap recordings would be stored in a bank vault or safe-deposit box and that many persons in the Department connected with this wiretap probe (including Neronha, Desnoyers, Adalio, DeSimone, and Daly) knew that the State was obliged to secure the evidence in this manner, consistent with (1) its historic practice (with regard to the earlier wiretaps in this case and wiretaps in general), (2) its obligations under the wiretap statutes and (3) the well-understood directives of the Presiding Justice. At least impliedly, therefore, the Presiding Justice ordered that the subject wiretap recordings be stored in a secure bank vault, thereby requiring the State to store the recordings in that fashion under the dictates of the storage provisions of the state and federal wiretap statutes.[8]
 C. The Wayward Box
Following the sealing ceremony, Desnoyers took possession of the sealed Box. She was responsible for delivering the Box to the safe-deposit box that the Department had rented at Sovereign Bank in Providence, Rhode Island Ostensibly because there was no available space in that safe-deposit box at the bank, Desnoyers brought the Box directly from Court to her office at the Department. She secreted the Box deep into a far corner under her desk, intending to temporarily store it there until someone could make space for it at the bank. She believed that it would be secure, as her desk was large and the Box could not be seen by anyone either standing or sitting at her desk. Desnoyers testified that her superiors knew about the lack of space at the bank and were working on getting more space. She knew that the Box needed to be kept secret and secure and that it was supposed to be stored at the bank.
On the one occasion in the past that the Presiding Justice recalls being informed by the Department at the time of sealing that the designated bank vault did not have sufficient space to hold the hundreds of wiretap tapes involved in that case, he made arrangements for the tapes to be stored in a locked room available to the Superior Court. See Affidavit of Presiding Justice, Joseph F. Rodgers, Jr. (May 13, 2004). An Assistant Attorney General removed those tapes from that locked room once he had sufficient space to store them according to standard practice. Id. In this case, however, no one in the Department alerted the Presiding Justice as to the claimed absence of storage space at Sovereign Bank nor did they take any action to secure a court-authorized alternative storage location (as the Department had done in the past), even though Desnoyers said that she and others were aware of the storage problems at the time the tapes and the Box were sealed.
Instead, Desnoyers kept the Box under her desk for approximately one year. According to Desnoyers, she informed Neronha about her storage of the Box and he did not object. Neronha testified credibly, to the contrary, that he was never so informed. Desnoyers explained that she may have informed him "in passing," and he may have believed that she was merely referring to Grand Jury tapes. Although Desnoyers believed that storing the Box under her desk was improper, she apparently failed to pursue the issue further and follow-up with appropriate personnel to obtain a secure storage location.
The next individual to acknowledge learning about the Box and its wayward storage was Adalio. Desnoyers told Adalio about the Box during the week of January 7, 2003, when the Department was in the midst of transition following the fall election of a new Attorney General. Desnoyers was to be reassigned to Kent County, DeSimone was to assume the previous duties of Desnoyers in Providence, and Adalio was to assume the workspace previously occupied by Desnoyers.[9] Desnoyers told Adalio that the Box under her desk contained wiretap tapes from the Picerno and Oster investigation and that it needed to be stored in a safe-deposit box.
According to Desnoyers, she checked the seal on the Box frequently (testimony which this Court doubts) and noticed it was intact when she was leaving for reassignment in January of 2003. Adalio first saw the Box during the moving period but apparently did not notice the status of the seals.[10] Sometime during the week of January 7, 2003, Adalio told DeSimone, the newly assigned Chief Paralegal, about the Box. Later that week, Adalio and DeSimone informed Paul Daly ("Daly"), the Chief of the Criminal Division of the Department, about the Box. Based on this conversation with Daly, Adalio and DeSimone decided to move the Box to a secure vault within the District Court Unit of the Department ("vault").
Adalio and DeSimone, however, could not immediately move the Box to the vault. The Department first needed to empty stored materials out of the vault. Adalio and DeSimone coordinated their efforts to gain access to the vault with the Department's Director of Operations, William Masse ("Masse"). Sometime within a month of January 7, 2003, Masse gave Adalio and DeSimone access to the vault. That same day, Adalio and DeSimone transferred to the vault the Box and a number of other boxes containing tapes of ongoing Grand Jury investigations from underneath the desk previously occupied by Desnoyers and then occupied by Adalio.
Although Adalio never noticed the status of the seal, DeSimone saw that the Box was unsealed when they were transferring it to the vault. She then opened the Box to determine its contents. DeSimone did not sift through the Box or otherwise disturb the tapes; she merely looked inside and described the Box on a sheet of paper.
The Box remained in the Department's vault until approximately September 29, 2003, when Assistant Attorney General Alan Goulart ("Goulart") asked DeSimone to locate the wiretap recordings for this case. Goulart sought to locate the tapes in preparation for the October 3, 2003 hearing at which the tapes would be unsealed in the presence of the Presiding Justice, the State, and defense counsel. DeSimone located the tapes for Sprint 114 and Verizon 115 in the vault and reported to Goulart that she had found the tapes in the vault but that the Box was unsealed.[11]
DeSimone and Goulart then went to Sovereign Bank in Providence, Rhode Island to locate tapes from the Sprint 113 wiretap[12] in a safe-deposit box. DeSimone and Goulart located the tapes from the Sprint 113 wiretap and then stored the tapes from the Sprint 114 and Verizon 115 wiretaps in a safe-deposit box.
 D. The Unsealing Hearing
On October 3, 2003, the Presiding Justice conducted a hearing, by agreement of the State and counsel for defendants Oster and Picerno, for the purpose of unsealing the wiretap applications, orders, and boxes of tapes ("unsealing hearing"). At the hearing, which was attended by Goulart and counsel for defendants Oster and Picerno, the Presiding Justice first unsealed all of the wiretap applications and orders that pertained to the Sprint 113, Sprint 114, and Verizon 115 wiretaps.[13] The applications, orders, the extensions of the orders, and an amendment to an order were sealed in six manila envelopes with seals bearing the signatures of the Presiding Justice (or Acting Presiding Justice) and an Assistant Attorney General. Counsel for defendants Oster and Picerno confirmed that the seals were intact prior to the Presiding Justice's unsealing of the envelopes.
The Presiding Justice then proceeded to unseal a box containing sealed tapes from the Sprint 113 wiretap. Counsel for Oster and Picerno confirmed that the seal on that box was intact. The Presiding Justice observed that his unsealing of the outer box was "with some measure of difficulty." Unsealing Hearing Transcript at 10. The Presiding Justice further indicated that each individual cassette tape appeared sealed. This box was not introduced into evidence during the Evidentiary Hearing.
The State then presented the Presiding Justice with the Box that is the subject of this Decision. The Box contained the recordings from the Sprint 114 and Verizon 115 wiretaps. The State admitted that the seal on the Box was broken and that, "despite the order signed by [the Presiding Justice] that this box remain in a safe-deposit box over at Sovereign . . .," the Box was left in an unsecured area in the Department.[14]See Transcript of Unsealing Hearing at 11 (October 3, 2003). The State explained that members of the Department would be producing affidavits indicating their knowledge as to the Box's storage and the reason, if known, as to why the seal on the Box was broken. Counsel for Oster announced that "it's very apparent by looking at this box that it's been opened. It's been opened, intentionally, with an implement to break numerous areas where it had been taped closed. . . ." Unsealing Hearing Transcript at 12. The Presiding Justice confirmed that "the seal has been broken, and it appears to be, obviously, intentional." Id. Shortly thereafter, the hearing concluded with the Presiding Justice affording counsel the opportunity to inspect the tapes and to present any concerns to him following that inspection. After inspecting the tapes, no one placed any concerns on the record. The parties agreed that the Court would maintain possession of the wiretap applications and orders, while the State would keep the wiretap tapes in a secure location.
 III. DISCUSSION
Arguing that the Box's broken seal and its troublesome storage violate R.I. Gen. Laws § 12-5.1-8(a) and 18 U.S.C. § 2518(8)(a) (collectively, "the Sealing Provision"),[15] defendant Oster requests that this Court suppress from his trial the tapes from the Sprint 114 and Verizon 115 wiretaps. Unlike the vast majority of disputes under the Sealing Provision, defendant Oster does not base his challenge on a delay in sealing the tapes.See, e.g., United States v. Ojeda Rios, 495 U.S. 257,109 L.Ed.2d 224, 110 S.Ct. 1845 (1990); United States v.Wilkinson, 26 F.3d 623 (6th Cir. 1994); United States v.Vastola, 989 F.2d 1318 (3d Cir. 1993); United States v. Mora,821 F.2d 860 (1st Cir. 1987). Instead, defendant Oster focuses his challenge on the breach of the Box's seal and the State's failure to store the Box in a bank safe-deposit box.[16]
The State maintains that no sealing violation occurred because the Presiding Justice never ordered the sealing of the Box, and the Sealing Provision does not require the Box to be sealed.[17] The State reasons that the Sealing Provision requires only the recordings to be made available to the Presiding Justice and requires only the recordings themselves — and not an additional outer box — to be sealed. Having previously concluded that a violation of the Sealing Provision could restrict use of the wiretap tapes,[18] this Court faces two primary questions: whether the Box's broken seal violates the Sealing Provision and, if so, whether the violation requires the Court to suppress the tapes.
 A. Sealing Violation
The Sealing Provision states that "[i]mmediately upon the expiration of the period of the order, or extensions [of the order], [the] recordings shall be made available to the [issuing judge] and sealed under his [or her] directions. . . . The presence of the seal provided for by this [section], or a satisfactory explanation for [its] absence, shall be a prerequisite for the use or disclosure of the contents of any wire, [electronic, or oral] communication. . . ."[19]18 U.S.C. § 2518(8)(a); R.I. Gen. Laws § 12-5.1-8(a). The primary purpose of the Sealing Provision is to protect the authenticity of the evidence and ensure that it is free from tampering or editing. Ojeda Rios, 495 U.S. at 263, 109 L. Ed.2d at 234-35,110 S.Ct. at 1849 (purpose is to ensure that the "Government has no opportunity to tamper with, alter, or edit the conversations that have been recorded") (emphasis added); Mora,821 F.2d at 867 (its "purpose and essence" is to "protect the authenticity and accuracy of the recordings").
Although protecting the authenticity of the recordings has been identified as the central thrust of the Sealing Provision, as most cases discuss the relationship between a sealing violation and the authenticity of the evidence, there is also a less-discussed, yet equally important, secondary purpose of the Sealing Provision: to maintain the confidentiality of the recordings. See, e.g., United States v. Abraham,541 F.2d 624, 627-28 (6th Cir. 1976) (purpose of sealing is "maintaining confidentiality of the recordings"); United States v. Bennett,825 F. Supp. 1512, 1527 (Colo. 1993) (Congress's purpose for requiring sealing was to guard integrity and maintain confidentiality of the recordings); United States v. Cantor,470 F.2d 890, 893 (3d Cir. 1972) ("sealing procedure required by18 U.S.C. § 2518(8)(a) is aimed at protecting the confidentiality of the tapes . . .").
Moreover, the Sealing Provision, together with the storage provisions of the state and federal statutes, help ensure that the integrity of the evidence, in terms of its completeness and its chain of custody, are preserved. The Sealing Provision seeks to guarantee that wiretap evidence that is generated pursuant to judicial authorization and presented to the Court for sealing is the same evidence that is ultimately disclosed to defendants and introduced at trial.
All of these goals are reflected in the legislative history of the Sealing Provision. The Senate Report on the Sealing Provision states that "[a]ppropriate procedures should be developed to safeguard the identity, physical integrity, and contents of the recordings to assure their admissibility into evidence." S. Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S. Code Cong. Admin. News 2112, 2193 (emphasis added). Further, in discussing the "safekeeping" of the recordings, the Senate Report states that the intent of 18 U.S.C. § 2518(8)(a) is to ensure that the sealed tapes be considered "confidential court records."Id.; see also United States v. Gigante, 538 F.2d 502, 505
(2d Cir. 1976) (citing same).
Regarding the actual procedure for sealing, the Sealing Provision does not specifically address the manner in which the Presiding Justice is to seal the wiretap tapes; it neither imposes nor limits the mechanics of the sealing process. See18 U.S.C. § 2518(8)(a); R.I. Gen. Laws § 12-5.1-8(a); see alsoUnited States v. Mora, 623 F. Supp. 354, 366 (D. Mass. 1985) (the Sealing Provision "does not delineate a specific procedure for sealing"). Rather, the Sealing Provision leaves the specifics of the sealing process to the discretion of the Presiding Justice. See United States v. Gigante, 538 F.2d 502, 504 (2d Cir. 1976) (judge "directs the manner of sealing and storing the recorded communications"); cf. Abraham, 541 F.2d at 628
(Sealing Provision "does not prescribe a particular type of seal nor has any court authoritatively done so"). Simply put, the Sealing Provision requires that the recordings be sealed "under [the Presiding Justice's] directions," whatever they may be.
In fact, court methods for sealing wiretap recordings vary greatly but generally ensure that the tapes, collectively, are sealed. See, e.g., United States v. Kincaide, 145 F.3d 771,777-778 (6th Cir. 1998) (pursuant to court order, law enforcement agents themselves seal tapes in envelopes; agents initial and date envelopes; agents seal envelopes in a box and place box in a cabinet); United States v. Rodriguez, 786 F.2d 472, 474 (2d Cir. 1986) (tapes placed in a box; box sealed with evidence seal; sealed box put in envelope; envelope then heat-sealed; heat-sealed envelope brought to judge for judicial sealing);United States v. Orozco, 630 F. Supp. 1418, 1534-1535 (S.D. Cal. 1986) (FBI agents place tapes in storage box; storage box then sealed by judge). Indeed, it is not unusual for the court to require not only that the individual tapes be sealed, but also that the box in which those tapes are placed be sealed. See,e.g., United States v. Mora, 623 F. Supp. 354, 365-66 (D. Mass. 1985) (investigators seal individual tapes at end of recording day; all individually sealed tapes ultimately sealed in large cartons by judge). Further showing that Congress has delegated to the courts the manner of effectuating sealing is the legislative history of the federal sealing provision wherein the Senate Report comments that "[a]ppropriate procedures should bedeveloped" to protect the "identity" and "integrity" of the recordings. S. Rep. No. 1097, 90th Cong., 2d Sess., reprintedin 1968 U.S. Code Cong. Admin. News 2112, 2193 (emphasis added).
Accordingly, the Sealing Provision did not limit the Presiding Justice's sealing directives to sealing only individual tapes; directives for additional, all-inclusive seals — such as sealing an outer box — are permissible and therefore valid directives. If the Presiding Justice directed that the recordings be sealed in a manner akin to Russian dolls, which is his prerogative, then the breaking of any one seal technically would violate the Sealing Provision.[20] The Presiding Justice has the discretion and authority to "develop" "appropriate procedures" to protect the integrity, confidentiality, and chain of custody of the recordings. See S. Rep. No. 1097, 90th Cong., 2d Sess.,reprinted in 1968 U.S. Code Cong. Admin. News 2112, 2193.
While sealing only individual tapes serves to safeguard their confidentiality and authenticity, sealing an outer box containing those tapes further advances these goals and also serves to preserve the collective integrity and chain of custody of the tapes. Sealing the individual tapes but not sealing that outer container could compromise the collective integrity, confidentiality and chain of custody of the recordings as well as increase the risk of tampering.
In addition to overlooking the confidentiality, collective integrity, and chain of custody aspects of sealing the Box, the State's position — that only individual tapes need be sealed and all-inclusive sealing is irrelevant — is also hard to reconcile with cases where it has been acceptable to seal only the box of tapes. The Court in Abraham, for example, provided a list of instructions on the minimum requirements for the sealing and custody of recordings and permitted the placing of recordings in one or more cartons with only the carton being taped closed.Abraham, 541 F.2d at 628; see also, e.g., United Statesv. Quintero, 38 F.3d 1317, 1329 (3d Cir. 1994) (tapes placed in box; judge seals and initials box); United States v. Orozco,630 F. Supp. 1418, 1534-1535 (S.D. Cal. 1986) (same); UnitedStates v. Abraham, 541 F.2d 624, 627, 629 (6th Cir. 1976) (placing tapes in cabinet drawers and taping drawers closed comply with sealing requirements). "Because tape recordings . . . are devastatingly effective evidence and are susceptible to tampering that is very difficult to discover . . .," it is perhaps better to seal both the tapes and the box of tapes; however, it is clear that the Sealing Provision leaves the manner of the sealing to the Presiding Justice's discretion. UnitedStates v. Boyd, 208 F.3d 638, 642 (7th Cir. 2000).
Additionally, the Sealing Provision does not require a specific order on the placing of each individual seal for the seal to have meaning under the Sealing Provision. Due to the Sealing Provision's silence on the mechanics of sealing and the Presiding Justice's wide discretion on the matter, any sealing that occurs during the presentation of the wiretap tapes to the Court for sealing occurs "under [the Presiding Justice's] directions." It is clear, therefore, that the seals placed on the Box were official seals pursuant to the Sealing Provision, as they were part of the "sealing under [the Presiding Justice's] directions." The sealing of the Box occurred in chambers with the Presiding Justice and upon the State's presentation of the tapes for sealing. The Presiding Justice supervised and, at the very least, consented to the sealing of both the Box and the individual tapes.
In fact, the Presiding Justice went further by actively participating in the sealing, thereby implicitly, if not explicitly, directing the sealing of the Box. The Box was not unilaterally sealed by the State. Rather, the seal was endorsed by both the Presiding Justice and the State. Furthermore, there can be no view that the State haphazardly placed left-over signed seals on the Box unbeknownst to the Presiding Justice; Desnoyers testified that that the Presiding Justice was careful not to sign extra labels.
This sealing is consistent with, and just as valid as, the sealing pertaining to the tapes comprising the Sprint 113 wiretap and the wiretap applications and orders. The absence of a signed court order or direct evidence of a verbal order to place the Box under seal does not alter this Court's view that the Box was sealed under the Presiding Justice's directives. Moreover, the State cannot defend by arguing the absence of a written sealing order required by the Sealing Provisions when it is its obligation to prepare all necessary wiretap orders for the Presiding Justice's signature.
Consequently, this Court finds that by the Presiding Justice and the State affixing seals to the individual tapes and the Box in which those tapes were placed, the "recordings" that comprise the Sprint 114 and Verizon 115 wiretaps were "made available to the [Presiding Justice]" and "sealed under his directions" within the meaning of the Sealing Provision. The breaking of the seal on the Box thus violates the Sealing Provision and requires the State to prove a "satisfactory explanation" for the seal's absence as a prerequisite for its use of those tape recordings at trial.
 B. Satisfactory Explanation Test
Having concluded that the broken seal on the Box violates the Sealing Provision, this Court next must determine whether the recordings, which were packaged within the broken seal, must be suppressed. This decision rests on whether the State has proven a "satisfactory explanation" for the broken seal. See generallyUnited States v. Ojeda Rios, 495 U.S. 257, 109 L.Ed.2d 224,110 S.Ct. 1845 (1990) (discussing satisfactory explanation test); United States v. Mora, 821 F.2d 860 (1st Cir. 1987) (same).[21] As outlined below, such a showing requires the State to: (1) provide an "explanation," that (2) is "satisfactory." The latter prong is twofold; it requires the State to: (a) prove the integrity of the tapes; and (b) demonstrate "good cause" by providing a reasonable excuse for the violation, which requires the Court to analyze a combination of factors in order to assess the sufficiency of the excuse. Seeinfra.
To provide a "satisfactory explanation," the State first must provide an explanation for the sealing violation. See OjedaRios, 495 U.S. at 264, 109 L. Ed.2d at 235, 110 S.Ct. at 1850
(holding that the "statute requires a satisfactory explanation, not just an explanation"). Prosecuting parties have provided a wide range of explanations for their sealing failures. See,e.g., Ojeda Rios, 495 U.S. at 266, 109 L. Ed.2d at 236,110 S.Ct. at 1850-51 (prosecutor supervising wiretap investigation mistakenly believed sealing not necessary until hiatus in investigation); United States v. Quintero, 38 F.3d 1317,1326-27 (3d Cir. 1994) (delayed sealing caused by prosecutor's preoccupation with complex trial and sealing judge's unavailability); United States v. Carson, 969 F.2d 1480,1497-98 (2d Cir. 1992) (delayed sealing for purposes of audio enhancement); United States v. Lopez, No. 99-79-P-C, 2000 U.S. Dist. LEXIS 8060, at *36-38 (D. Me. April 28, 2000) (delay in sealing adequately explained by judge's unavailability); UnitedStates v. Caruso, 415 F. Supp. 847, 850-51 (S.D.N.Y. 1976) (sealing violation explained by a "flurry of excitement" caused by unexpected hospitalization of prosecutor and "tip-off to targets of the tap"). The explanation must be the actual reason for the violation. See Ojeda Rios, 495 U.S. at 267-68,109 L. Ed.2d at 237, 110 S.Ct. at 1851-52 (O'Connor, J., concurring, joined by Blackmun, J.). The State cannot merely offer an ulterior excuse or an inexplicable "administrative bungle."United States v. Quintero, 38 F.3d 1317, 1326-27 (3d Cir. 1994) (citing United States v. Vastola, 989 F.2d 1318, 1323 (3d Cir. 1993)); United States v. Wright, 156 F. Supp.2d 1218, 1231 (D. Kan. 2001).
Of course, the total absence of an explanation is insufficient; it is axiomatic that the phrase "satisfactory explanation" presupposes the existence of some explanation. See18 U.S.C. § 2518(8)(a); R.I. Gen. Laws § 12-5.1-8(a). Indeed, the United States Supreme Court, in holding that a simple explanation is insufficient because the explanation must be satisfactory, noted that "[i]t is difficult to imagine a situation in which the [prosecution] could not explain why [a sealing violation occurred]." Ojeda Rios, 495 U.S. at 264, 109 L. Ed.2d at 235,110 S.Ct. at 1850 (declining to require only an explanation and showing of authenticity).
The second prong of the satisfactory-explanation test requires the State's explanation to be "satisfactory." See id.;Mora, 821 F.2d at 867. In making this determination, the Court first must decide whether the State "has established by clear and convincing evidence that the integrity of the tapes has not been compromised." Mora, 821 F.2d at 867. Where the State does not carry this burden by clear and convincing evidence, "no explanation, howsoever compelling otherwise, can be a satisfactory one." Id. at 868. The magnitude of this factor necessitates the State's carrying of a "higher quantum of proof."[22] Mora, 821 F.2d at 867. "[A]ny doubts about the integrity of the evidence should be laid at [the State's] doorstep. It would be illogical (and unfair) to ask an accused to prove affirmatively that tampering has occurred." Id. at 868.
"[A]lthough freedom from adulteration is a necessary part of what the prosecution must show, it is by no means the extent of the proof which [this Court] will demand in these circumstances."Mora, 821 F.2d at 868. The State must demonstrate good cause by providing a reasonable excuse for the violation. Ojeda Rios,495 U.S. at 265-66, 109 L. Ed.2d at 236, 110 S.Ct. at 1850-51. As observed by the Court in Ojeda Rios, such a showing is essential and cannot be substituted for a simple explanation and a showing of authenticity because tampering may not always be easily detected and the plain words of the sealing provision require more. Ojeda Rios, 495 U.S. at 264-65,109 L. Ed.2d at 235, 110 S.Ct. at 1850 (holding that prosecution must "explain not only why the [failure] occurred but also why it is excusable").
The hodgepodge of elements the Court must consider to assess the sufficiency of the excuse include: (1) whether the violation may have caused prejudice to the accused; (2) whether the State benefited unfairly or obtained a tactical advantage as a result of the failure; (3) the length of time for which the seal was absent;[23] and (4) the cause of the violation, including whether the State's failure was willful or arose out of an honest mistake.[24] See Mora, 821 F.2d at 868-69 (discussing factors); see also United States v. Suarez, 906 F.2d 977,982 (4th Cir. 1990) (combining Ojeda Rios and Mora tests);United States v. Wilkinson, 26 F.3d 623, 628 (6th Cir. 1994) (quoting same). It is important for the Court to consider these factors and make "particular findings and conclusions regarding the circumstances of, and the reasons given for," the State's failure. Wilkinson, 26 F.3d at 628 (6th Cir. 1994) (disapproving of lower court's lack of findings on Ojeda Rios
and Mora factors). The Court must find that the State proved its satisfactory explanation by a fair preponderance of the evidence. Mora, 821 F.2d at 869.
 1. The Absence of Any Explanation
At the Evidentiary Hearing in the present case, the State was unable to explain the absence of the seal on the Box. See18 U.S.C. § 2518(8)(a); R.I. Gen. Laws § 12-5.1-8(a) (requiring "satisfactory explanation for [seals'] absence"). Apart from providing an explanation that is satisfactory, the State providedno reason whatsoever for the seal being broken. This Court is unaware of any case where the prosecution was unable to offerany explanation for the absence of sealing. See supra
(citing range of explanations offered). Indeed, as recognized by the United States Supreme Court, "[i]t is difficult to imagine a situation [such as this one] in which the [prosecution] could not explain why [a sealing violation occurred]. Ojeda Rios,495 U.S. at 264, 109 L. Ed.2d at 235, 110 S.Ct. at 1850.
The State attempted to explain why the Box was stored in an insecure area in the Department of the Attorney General for a year, notwithstanding the longstanding practice of the Department and at least an implied directive of the Presiding Justice to store the sealed wiretap evidence in a bank vault or a safe-deposit box. The State also attempted to explain the handling of the Box by different people in two different administrations while it was in the custody of the Department. Through this evidence, the State obliquely attempts to suggest that the Department kept the Box "secured" and that the seal was inadvertently broken during the moving and transition period for Department staff. See supra note 10 (office described as a "mess" and in "chaos" following transition).
While these circumstances undoubtedly created an opportunity for the seal on the Box to be broken under a host of imaginable scenarios, they in no way explain the reason why the seal was broken. See 18 U.S.C. § 2518(8)(a); R.I. Gen. Laws §12-5.1-8(a) (requiring "satisfactory explanation for [seals'] absence"); Ojeda Rios, 495 U.S. at 265, 109 L. Ed.2d at 236,110 S.Ct. at 1850 (prosecution must explain why violation occurred and why it is excusable). Based on this evidence, it is possible that the seal on the Box was broken inadvertently, as the State attempts to suggest. Yet there are also other, less benign explanations that are equally possible, particularly given (1) the State's failure to properly store the Box in the first instance and for a prolonged period of time thereafter in violation of its established custom and the directives of the Presiding Justice, (2) its inability to explain why the seal was broken and (3) the existence of one or two blank duplicate tapes.
For this Court to make a finding of fact in this case, on the state of the evidence, as to how and why the seal on the Box was broken, it would have to engage in the kind of rank speculation that the law forbids. See State v. Perry, 770 A.2d 882,885-86 (R.I. 2001). This Court is entirely unable to determine the reason for the broken seal on the Box and refuses to speculate. Consequently, the State has failed to carry its burden to establish, by a fair preponderance of the evidence, Mora,821 F.2d at 869, the actual, precise reason for the seal's absence. See Ojeda Rios, 495 U.S. at 267-68,109 L. Ed.2d at 237, 110 S.Ct. at 1851-52 (O'Connor, J., concurring, joined by Blackmun, J.) (excuse must be actual reason for violation);United States v. Quintero, 38 F.3d 1317, 1326-27 (3d Cir. 1994) (inexplicable "administrative bungle" insufficient).
The blame for not being able to offer the legally required explanation for the broken seal must rest squarely with the State. The Box containing the recordings from the Sprint 114 and Verizon 115 wiretaps should have been stored in a bank vault or safe-deposit box, as at least impliedly directed by the Presiding Justice in accordance with past practice. That is the manner in which the State stored the recordings from the Sprint 113 wiretap and the applications and orders for all of the wiretaps connected with this case. Indeed, that is the manner in which the State historically stored all sensitive wiretap evidence and which all prosecutors and staff members involved with the wiretap evidence in this case recognized was appropriate.
If it is true that the only bank vault in which the Department could have stored the Box was full when the tapes and the Box were sealed, the State should have obtained an alternative, court-authorized secure location, at least temporarily. According to the Presiding Justice, just such an alternative (that of temporary court-authorized storage in a secure court vault) had been arranged under his auspices on at least one occasion in the past when the State lacked the immediate ability to store wiretap evidence in a bank vault. Allegedly armed with the same knowledge of the absence of bank storage space in this case at the very time that the subject tapes and the Box were sealed, the State inexplicably chose to depart from past practice and the implied directives of the Presiding Justice in storing the tapes in a bank vault and did not raise with the Court the need for court-authorized alternative secure storage space. It then failed to take any steps internally over the course of a year either to store the tapes in a more secure location than under a paralegal's desk or to obtain additional storage space at a bank.[25]
It is these failures in the handling of wiretap evidence — evidence known by the State to be sensitive and critical to its widespread corruption probe — that deprive the State of its ability to explain the broken seal on the Box. In turn, the State's inability to explain the broken seal is dispositive of the issue of whether the tape recordings at issue may be used at trial, as an explanation is required pursuant to the Sealing Provision where a seal is absent. See Ojeda Rios,495 U.S. at 264-65, 109 L. Ed.2d at 235, 110 S.Ct. at 1850 (requiring prosecution to explain why a sealing violation occurred). In addition, the State's lack of an explanation is troubling because tampering and a violation of the confidentiality of wiretap evidence may not always be easily detected and the plain words of the Sealing Provision require more than what the State provided.Compare id. (stating rationale for requiring more than showing of authenticity) with supra subheading (II)(C) (outlining what is known about the Box's care and exposure to potential tampering and breach of confidentiality).
Accordingly, this Court need not address whether there is a "satisfactory" explanation for the broken seal on the Box, for there is no explanation to qualitatively assess. In the absence of an explanation, the subject tape recordings must be suppressed under the plain dictates of the Sealing Provision.
 2. Unsatisfactory Explanation a. Integrity
Even assuming, arguendo, that the State has provided an "explanation" for the absence of the seal on the Box, it nonetheless fails to establish the first element necessary for its "explanation" to be considered "satisfactory." This Court is unable to come to a "clear conviction without hesitancy" as to the integrity of the tapes. See Parker v. Parker,103 R.I. 435, 442 (R.I. 1968). Integrity, in the context of this case and given the purposes of the Sealing Provision, includes proof that the tapes (1) remained in an unimpaired or unmarred condition, (2) that they were the same tapes that were placed in the Box at the time of sealing, and (3) that their confidentiality was preserved following sealing. See supra subheading (III)(A) (outlining purpose and legislative history of the Sealing Provision).
While the evidence may suggest that the tapes were secure at the intercept post, this Court is unable to find that the State met its burden to prove, by clear and convincing evidence, that the tapes that were sealed and placed in the sealed Box under the auspices of the Presiding Justice remained intact collectively, uncompromised and confidential after the Department took custody of the Box and the seal was broken. See Mora,821 F.2d at 867-68 (discussing requisite burdens of proof and persuasion). The State's failure to store the Box in accordance with established custom and practice and the implied directives of the Presiding Justice, the fact that the Box remained in an unsecured area for approximately one year and unsealed for an unknown period of time, and the inexplicable opening of the Box by an unknown individual simply raise too many unanswered questions for this Court to be satisfied that the State met its high burden.See Parker, 103 R.I. at 442 (for clear and convincing evidence, facts should enable fact-finder to reach conclusion with little hesitancy). The improper storage of the Box and the circumstances surrounding its custody and its opening certainly compromised its confidentiality and created, at a minimum, anopportunity to tamper with the evidence in the Box — the very opportunity that the sealing and storage provisions of the state and federal wiretap statutes, the Department's custom and practice in dealing with the sealing and storage of sensitive wiretap evidence, and the directives of the Presiding Justice are designed to guard against. See Ojeda Rios, 495 U.S. at 263,109 L. Ed.2d at 234-35, 110 S.Ct. at 1849 (purpose of the sealing provision of the federal wiretap statute is to ensure that the "Government has no opportunity to tamper with, alter, or edit the conversations that have been recorded") (emphasis added). Further exacerbating this Court's concerns about the integrity of the subject tapes is the inexplicable existence of one or two blank duplicate tape recordings that were to have served as accurate copies of the original tapes placed in the Box. Although any such blank tapes may have resulted from a mere technological glitch, this occurrence, along with all of the other unanswered questions, combine to blur the Court's vision of the tapes' integrity, to which the State has been unable to focus to the desired crisp level of clarity that is necessary for clear and convincing proof.
The fact that the Box, at the time of unsealing, apparently contained the same number of tapes as were placed in the Box originally and the fact that those tapes apparently had intact seals at the time of the unsealing ceremony do not, by themselves, get the State to the clear and convincing level of proof — at least not when suspicious circumstances are created by the State's failure to store the Box properly, the mysterious events surrounding the broken seal on the Box and the existence of one or more blank duplicate tapes. In addition, there was insufficient evidence presented as to the nature and authenticity of the seals on the individual tapes, the identity, authentication and chain of custody of the tapes from the time that they were placed in the Box until the unsealing ceremony, and the confidentiality of this wiretap evidence during that time period. The evidence presented did not even include the physical evidence at issue, inclusive of the Box itself, the box used to store the tape recordings of the Sprint 113 wiretap, the envelopes used to store the applications and orders connected with the case, and the subject tape recordings and seals on those tapes. While there is no evidence to cause the Court to believe that the State engaged in a "purposeful attempt to evade the law or unfairly to pillory a suspect . . .," Mora, 821 F.2d at 870, there likewise is insufficient evidence to clearly convince the Court that the tape recordings that were put into the Box at the time of its sealing were the same tapes in the same condition and carrying the same degree of confidentiality as the tapes that came out of the Box at the time of its unsealing.
 b. Good Cause: Reasonableness of Excuse
Because the State has not satisfied its burden with regard to the integrity of the tapes, no "explanation" can be "satisfactory." Mora, 821 F.2d at 868. Nevertheless, even assuming, arguendo, that the State was able to hobble (with crutches) past the integrity hurdle, the State's "explanation" is still a marathon away from the finish line. The unanswered questions associated with the sealing and storage of the wiretap evidence preclude the Court from making findings of fact and conclusions of law regarding the sufficiency of the State's excuse for the broken seal. See United States v. Wilkinson,26 F.3d 623, 628 (6th Cir. 1994) (criticizing court that found excuse reasonable without Ojeda Rios and Mora analysis). First, the above-discussed integrity issues (inclusive of issues as to the authenticity, completeness, confidentiality and chain of custody of the tapes) prevent this Court from meaningfully assessing the possibility of either the prejudice to defendant Oster or unfair advantage to the State from the sealing violation. See Mora, 821 F.2d at 868, 870 (discussing elements). Second, the mysterious circumstances surrounding the breaking of the seal on the Box prevent the Court from determining whether the broken seal occurred willfully or arose out of an honest mistake. See Mora, 821 F.2d at 868, 870 (applying factors). Third, the Court is unable to determine the length of time for which the seal was broken. When Desnoyers last saw the Box before leaving for reassignment, the seal supposedly was intact. When DeSimone first saw the seal, it had been broken. And Adalio never noticed the status of the seal. Assuming the worst, the Box was without a seal and outside a bank vault for close to two years (from the time the Box was placed under the desk on February 19, 2001 until September 2003 when it was taken to the bank). At a minimum, it was without a seal and stored in an insecure area for many weeks until placed in an internal vault in the Department sometime within a month of January 7, 2003; even then, it was not stored in a bank vault as required.
Lastly, had any cause been offered, the Court would have been less inclined to find it excusable under the circumstances. Regardless of any explicit judicial orders on sealing the tapes, sealing the Box, or storage, those with supervisory capacity over this case knew of the solemnity of care associated with this evidence, as highlighted by the (1) State's careful handling of the tape recordings from the Sprint 113 wiretap and the applications and orders associated with the case, (2) Assistant Attorney General Goulart's apparent shock and displeasure upon learning about the Box[26] and, (3) his candor in acknowledging the sealing and storage problems at the time of the unsealing hearing. Yet, the storage of the Box violated the Department's established customs and the Presiding Justice's implied directives, thus leaving the Box's seal susceptible to breaking. The seal on the Box likely would not have been broken if stored in the proper secured area. Simply put, the sealing problem is less excusable because it never should have happened — particularly in a post-DiPrete environment[27] — and was easily avoidable if Department protocol and judicial directives had been followed.
 IV. CONCLUSION
For the reasons set forth in this Decision, this Court finds that the State violated R.I. Gen. Laws § 12-5.1-8(a) and18 U.S.C. § 2518(8)(a) and thus applies the exclusionary remedy contained therein, as the State failed to offer a satisfactory explanation for the absence of sealing of the Box that was employed pursuant to these statutory provisions. Consequently, this Court grants, in part, defendant Oster's motion to suppress wiretap evidence and suppresses only the contents of wiretap recordings from the Sprint 114 and Verizon 115 wiretaps.
Counsel are directed to confer and to submit to the Court forthwith for entry an agreed upon form of order that is reflective of this Decision.
[1] Initially, defendant Oster relied solely on the sealing provision of the state wiretap statute, R.I. Gen. Laws §12-5.1-8(a). See "Defendant Oster's Memorandum in Support of His Motion to Suppress the Fruits of Electronic Surveillance," at 11-12 (Dec. 17, 2003). In his supplemental memorandum of law following this Court's partial decision on his motion to suppress and its evidentiary hearing, defendant Oster now relies on the sealing provisions of both the state and federal wiretap statutes. See "Jonathan Oster's Memorandum in Support of His Motion to Suppress the Fruits of Electronic Surveillance," at 1-2 (May 14, 2004).
[2] In its March 10, 2004 decision, this Court decided defendant Oster's motion to suppress jointly with defendant Robert Picerno's similar motion to suppress wiretap evidence. Following that decision, on March 24, 2004, defendant Picerno pleaded nolo contendre to all seven counts of the Indictment against him: four counts of soliciting or attempting to solicit a bribe and three counts of conspiracy to do the same in violation of R.I. Gen. Laws §§ 11-7-3 and 11-1-6 (1956). The Court accepted his plea and sentenced defendant Picerno to eight years at the Adult Correctional Institutions, with three years to serve and the balance of the sentence suspended with probation.
The State argued, in connection with the defendants' joint suppression motion, that defendant Oster lacked standing to challenge the admissibility of the wiretap evidence. See Statev. Picerno, C.A. No. P1-02-3047B, State v. Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *13-15 (March 10, 2004); "State's Memorandum of Law in Support of Its Objection to the Defendants' Motions to Suppress Wiretap Evidence," at 10-11 (Jan. 2, 2004) (challenging standing because the protected "Fourth Amendment rights are personal"). This Court found, in its March 10, 2004 decision, that it did not need to reach that issue because, among other reasons, defendant Picerno had standing and challenged the evidence on grounds identical to those advanced by defendant Oster, thus enabling the Court to consider the issues regardless of defendant Oster's ability to present his arguments.State v. Picerno, C.A. No. P1-02-3047B, State v. Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *13-15 (March 10, 2004). Assuming, arguendo, that the Court now must reexamine defendant Oster's standing because defendant Picerno is no longer a party to the motion to suppress, the Court finds no merit to the State's standing argument with respect to the sealing provisions of the state and federal wiretap statutes. Unlike most wiretap challenges, the sealing requirements are not based on the Fourth Amendment protection from unreasonable searches and seizures; rather, they are designed to preserve the integrity, confidentiality, completeness and confidentiality of the tapes.See United States v. Ricco, 421 F. Supp. 401, 405-06
(S.D.N.Y. 1976) (because sealing requirement pertains to integrity, any litigant has standing). Therefore, the State's argument — that defendant Oster "should be prohibited from contesting the admissibility of [calls to which he was not a participant] on Fourth Amendment grounds . . ." — is not applicable in this context. Compare id. with "State's Memorandum of Law in Support of Its Objection to the Defendants' Motions to Suppress Wiretap Evidence," at 10-11 (Jan. 2, 2004);see also State v. Picerno, C.A. No. P1-02-3047B, State v.Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *101 (March 10, 2004) (sealing provisions provide a freestanding basis for suppression, independent of the "aggrieved person" language of R.I. Gen. Laws § 12-5.1-12(a) and 18 U.S.C. § 2518(10)(a)). In addition, defendant Oster was a participant to some recorded conversations that were stored inside the Box, thus enabling him as a participant (even under the State's view) to challenge the sealing of the Box. See "State's Memorandum of Law in Support of Its Objection to the Defendants' Motions to Suppress Wiretap Evidence," at 10-11 (Jan. 2, 2004).
[3] This Court found that while R.I. Gen. Laws § 12-5.1-12(a) (general suppression provision) does not provide suppression as a remedy for a sealing violation under § 12-5.1-8(a) (sealing of recordings), § 12-5.1-8(a) provides its own freestanding basis for suppression, independent of § 12-5.1-12(a). State v.Picerno, C.A. No. P1-02-3047B, State v. Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *93-101 (March 10, 2004). Section 12-5.1-8(a) provides suppression as a remedy for a failure to properly seal the recordings in accordance with the directives of the court, not for a failure to properly store the recordings. Id.; see also infra note 16 (storage affects suppression analysis for sealing failures under § 12-5.1-8(a)). Section 12-5.1-12(a) provides suppression as a remedy for a sealing violation under § 12-5.1-8(b) (sealing of affidavits and orders). Id.; see also State v. Campbell, 528 A.2d 321,328-30 (discussing sealing requirements of § 12-5.1-8).
[4] Salient factors for this Court to consider in making these determinations — as this Court indicated in its March 10, 2004 decision — include the nature of the wiretap evidence presented to the Presiding Justice for sealing; the circumstances attending its presentation; the Presiding Justice's directions regarding the sealing and storage of the recordings; the purpose of those directives; the execution of those directives; the explanation for and effect of any failure to comply with those directives; the handling of the recordings after any failure to seal; the nature of the evidence at the time of unsealing as compared to its nature at the time of sealing; whether the integrity of the tapes has been compromised; whether any violations benefited the prosecution or prejudiced the defendants; and whether any violations were deliberate or inadvertent. State v. Picerno,
C.A. No. P1-02-3047B, State v. Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *102 n. 31 (March 10, 2004).
[5] Set forth below are this Court's findings as to the facts pertinent to the matter now before the Court. For additional facts pertaining to the State's electronic wiretap surveillance for this case, see State v. Picerno, C.A. No. P1-02-3047B,State v. Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57 (March 10, 2004). Following immediately is a chronology of relevant events as they unfolded, and additional factual findings are provided in later parts of this Decision in connection with the discussion of specific issues. This Court's findings are based on the credible testimony offered and the exhibits introduced at the hearing, as well as the reasonable inferences drawn therefrom.
[6] See State v. Picerno, C.A. No. P1-02-3047B, State v.Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57 at *5-8 (March 10, 2004) for more details concerning these wiretaps and their dates of authorization and extension. Prior to obtaining the Sprint 114 and Verizon 115 wiretaps, the State obtained a wiretap entitled Sprint 113. Id. Defendant Oster does not challenge the State's storage and sealing of the tapes that comprise the Sprint 113 wiretap. Id. at *85-86.
[7] The investigators used only one side of the tapes to record communications and replaced each tape with a new one as needed.
[8] Confusion over whether the Presiding Justice in fact ordered the Department to store the wiretap tapes at issue here in a bank vault or safe-deposit box has continued throughout the pre-trial stages of this case. At the October 3, 2003 unsealing hearing and the January 14, 2004 hearing on the defendants' motions to suppress wiretap evidence, the State conceded that the recordings that comprised the Sprint 114 and Verizon 115 wiretaps were not stored in accordance with the Presiding Justice's order.See "State's Supplemental Memorandum of Law in Support of Its Objection to the Defendant's Motions to Suppress Wiretap Evidence" at 2 (April 27, 2004); Transcript of Unsealing Hearing at 11 (October 3, 2003). This Court noted in its prior decision on the defendants' motions to suppress, however, that the wiretap orders presented to the Court as of that date were silent as to the storage of the tapes. See State v. Picerno, C.A. No. P1-02-3047B, State v. Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *87 n. 29 (March 10, 2004). Nevertheless, this Court entertained the Evidentiary Hearing to determine, in part, whether the Presiding Justice ever issued any written or verbal orders or implied directives as to the storage of the recordings. See id. at *102 n. 31 (noting that an evidentiary hearing on the sealing and storage issues will allow the parties to present evidence on the Presiding Justice's directions for storing the recordings). The State has since retreated from its earlier position by indicating that it was incorrect in conceding that the tapes comprising the Sprint 114 and Verizon 115 wiretaps were not stored in accordance with the Presiding Justice's order, as no such written order exists. See "State's Supplemental Memorandum of Law in Support of Its Objection to the Defendant's Motions to Suppress Wiretap Evidence" at 2 (April 27, 2004).
The absence of a formal written or verbal order issued in connection with the sealing ceremony, however, does not alter this Court's view that the Presiding Justice impliedly ordered or directed, pursuant to the storage provisions of the state and federal wiretap statutes, that the tapes at issue be stored in a bank vault or safe-deposit box. Such an order necessarily must be implied from the past practice of the Department and the Presiding Justice in storing wiretap evidence, the understanding of the parties and the Presiding Justice that the subject tapes would be stored in that manner, the State's view that an order in fact existed (as evidenced by the testimony of Neronha, Goulart's statements at the unsealing hearing and the State's earlier concessions in this regard) and the absence of any discussion about storage at the time of sealing. The State should not be able to circumvent the requirements of the statutory storage provisions by maintaining that the requisite order regarding storage was never signed by the Presiding Justice, as it is the obligation of the State to prepare whatever orders are necessary to effectuate the statutes and the intent of the Presiding Justice.
[9] While Desnoyers had experience working on wiretap investigations since 1999, including attending sealing and unsealing ceremonies, Adalio and DeSimone had no prior experience with wiretap cases.
[10] Adalio and DeSimone described the offices as a "mess" and in "chaos" following the transition.
[11] DeSimone testified about an awkward silence and apparent shock and displeasure from Goulart upon his learning that the Box had been unsealed and stored in the vault rather than in a safe-deposit box.
[12] See supra note 6 (identifying Sprint 113).
[13] In each of the written orders of the Presiding Justice that authorized the wiretaps, the Presiding Justice ordered that the underlying applications and the order itself "shall be sealed by the Presiding Justice and shall be retained in a safe deposit box in a bank in the City of Providence, Rhode Island at his direction."
[14] See supra note 8 and accompanying text (explaining confusion over storage requirements for the Box). Although apparently no written order exists regarding the Box's storage, the State's failure to store the Box in a safe-deposit box, as impliedly ordered by the Presiding Justice, will affect the admissibility of the recordings as evidence. See infra note 16 (indicating suppression not a remedy for improper storageper se, but storage will affect suppression analysis).
[15] In previously discussing R.I. Gen. Law § 12-5.1-8(a), this Court noted that it is bound by the requirements of the federal sealing provision, 18 U.S.C. § 2518(8)(a), as "the federal wiretap statute `has preempted the field in wiretap and established minimum standards for the admissibility of [wiretap evidence].'" State v. Picerno, C.A. No. P1-02-3047B, State v.Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *99-100 (March 10, 2004) (quoting Pulawski v. Blais,506 A.2d 76, 76-77 (R.I. 1986)). In addition, the pertinent part of both the state and federal sealing provisions are nearly identical; both sections provide that "[i]mmediately upon the expiration of the period of the order, or extensions [of the order], [the] recordings shall be made available to the [issuing judge] and sealed under his [or her] directions. . . . The presence of the seal provided for by this [section], or a satisfactory explanation for [its] absence, shall be a prerequisite for the use or disclosure of the contents of any wire, [electronic, or oral] communication. . . ." 18 U.S.C. § 2518(8)(a); R.I. Gen. Laws § 12-5.1-8(a). This Court also has construed the state sealing provision consistent with federal courts' construction of the federal sealing provision. See State v. Picerno, C.A. No. P1-02-3047B, State v. Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *99-100 (March 10, 2004). For these reasons and for ease of reference, this Court thus will cite and refer to the state and federal sealing provisions as "the Sealing Provision," collectively, and will cite federal precedents as authority on both the state and federal sealing provisions, unless a distinction is warranted and so noted.
[16] Following the Evidentiary Hearing and this Court's Decision in State v. Picerno, C.A. No. P1-02-3047B, State v.Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *99-100 (March 10, 2004), the State and defendant Oster, in their supplemental memorandums of law, continue to discuss suppression as a remedy for the errant storage of the Box. This Court, however, has already held that § 12-5.1-8(a) "imposes no restriction on the use and disclosure of wiretap recordings that are not stored in accordance with the statute." State v.Picerno, C.A. No. P1-02-3047B, State v. Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *93 (March 10, 2004). Such a violation may be punished as contempt. Id. Although improper storage standing alone does not subject the tapes to suppression, the tapes' storage will weigh on this Court's consideration of whether any sealing violation requires suppression because less secure storage, of course, may produce a sealing violation, make such a violation difficult to explain or to explain satisfactorily and make the tapes more susceptible to possible tampering and breach of their confidentiality. Seeinfra.
[17] Although the State has since altered its position, seesupra note 8, it previously conceded that the seal on the Box was broken and that the Box was not stored in accordance with the Presiding Justice's order. The State indicates in its supplemental memorandum that this Court previously mischaracterized these concessions as including a concession that the Presiding Justice directed the State to seal the Box. Even assuming that the State did not expressly concede this point, the Court reasonably inferred such a concession from arguments that were made and not made by Stephen Dambruch, as prior counsel for the State, during the January 14, 2004 hearing (including his responses and lack of responses to defense counsel's arguments). Nevertheless, this Court finds that the Presiding Justice directed the sealing of the Box, regardless of any concession.See infra subheading (III)(A) (considering sealing violation).
[18] See State v. Picerno, C.A. No. P1-02-3047B, State v.Oster, C.A. No. P1-02-3047A, 2004 R.I. Super. LEXIS 57, at *94-101 (March 10, 2004).
[19] Section 12-5.1-8(a) of the Rhode Island General Laws provides in its entirety that
 [t]he contents of any wire, electronic, or oral communication intercepted by any means authorized by this chapter shall, if practicable, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, electronic, or oral communication under this section shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions of the order, the recordings shall be made available to the presiding justice of the superior court issuing the order and sealed under his or her directions. Custody of the recordings shall be wherever the presiding justice of the superior court orders. They shall not be destroyed except upon an order of the presiding justice of the superior court, and in any event, shall be kept for ten (10) years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of § 12-5.1-10(a) or (b) for investigations and bail hearings and any pre-trial hearings. The presence of the seal provided for by this section, or a satisfactory explanation for its absence, shall be a prerequisite for the use or disclosure of the contents of any wire, electronic, or oral communication or evidence derived from them at any bail hearing or pre-trial hearing.
In its entirety, 18 U.S.C. § 2518(8)(a) provides that
 [t]he contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter [18 U.S.C. § 2510 et seq.] shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his [or her] directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.
[20] A "Russian doll" is "any of a set of hollow wooden dolls, the smallest of which fits inside the next smallest, and so up to the largest." 3 Oxford English Dictionary 1416 (Compact ed. 1987). Note that intact inner seals are not rendered irrelevant once an outer seal is breached and a sealing violation occurs. Unblemished inner seals will bear on the integrity of the tapes, which is part of the "satisfactory explanation" hurdle the State is required to meet once the Sealing Provision is violated. SeeMora, 821 F.2d at 867-68 (discussing integrity as a factor of the satisfactory explanation test); see also infra
subheading (III)(B) (analyzing "satisfactory explanation" requirements).
[21] In construing the "satisfactory explanation" requirements of the Sealing Provision, this Court relies primarily on UnitedStates v. Ojeda Rios, 495 U.S. 257, 109 L.Ed.2d 224, 110 So. Ct. 1845 (1990) and United States v. Mora, 821 F.2d 860 (1st Cir. 1987). Mora is consistent with the United States Supreme Court's directives in Ojeda Rios and more detailed with respect to the issues in the present case. See United States v.Suarez, 906 F.2d 977, 982 (4th Cir. 1990) (combining OjedaRios and Mora tests); United States v. Wilkinson,26 F.3d 623, 628 (6th Cir. 1994) (same). Although the United States Supreme Court decided the Ojeda Rios case after Mora, Mora
remains the seminal case with respect to claimed sealing violations. See United States v. Lopez, No. 99-79-P-C, 2000 U.S. Dist. LEXIS 8060, at *36-38 (D. Me. April 28, 2000) (applying Mora factors); Commonwealth v. D'Amour,704 N.E.2d 1166, 1178 (Mass. 1999) (same).
[22] Clear and convincing evidence, of course,
 is a degree of proof different from a satisfaction by a "preponderance of the evidence" which is the recognized burden in civil actions and from proof "beyond a reasonable doubt" which is the required burden in criminal suits. If [the Court] could erect a graduated scale which measured the comparative degrees of proof, the "preponderance" burden would be at the lowest extreme of our scale; "beyond a reasonable doubt" would be situated at the highest point; and somewhere in between the two extremes would be "clear and convincing evidence. . . ." [P]roof by "clear and convincing evidence" means that the [finder of fact] must believe that the truth of the facts asserted by the proponent is highly probable. One of the more articulate and descriptive definitions of clear and convincing evidence . . . [is that] it must be shown by clear and convincing evidence . . . [that] the witnesses to a fact must be found to be credible and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order and that the testimony be clear, direct and weighty and convincing, so as to enable you to come to a clear conviction without hesitancy of the truth of the precise facts in issue.
Parker v. Parker, 103 R.I. 435, 442 (R.I. 1968) (internal citations omitted) (emphasis added).
[23] In most cases, the issue is the length of the delay before the prosecution seals the tapes in the first instance, rather than the length of time the seal is absent or broken. See,e.g., United States v. Ojeda Rios, 495 U.S. 257,109 L.Ed.2d 224, 110 S.Ct. 1845 (1990); United States v. Wilkinson,26 F.3d 623 (6th Cir. 1994); United States v. Vastola,989 F.2d 1318 (3d Cir. 1993); United States v. Mora, 821 F.2d 860 (1st Cir. 1987). Untimely seals and absent seals are nevertheless comparable and require similar scrutiny. See Ojeda Rios,495 U.S. at 263-64, 109 L. Ed.2d at 234-35, 110 S.Ct. at 1849-50;Mora, 821 F.2d at 864-65. The Court in Ojeda Rios explained that the Government is required to explain either the "total absence of a seal" or the "absence of a timely applied seal," reasoning that both requirements are necessary to fulfill Congress' goal of limiting the Government's opportunity to alter the recordings. Ojeda Rios, 495 U.S. at 263-64,109 L. Ed.2d at 234-35, 110 S.Ct. at 1849-50.
This factor is partly a subset of the above factors. A long-absent seal, for example, creates a greater danger of adulteration, and it also makes it more difficult for the State to show the absence of prejudice. Mora, 821 F.2d at 868.
[24] Although these are significant factors, there is no stock formula. Id. The factors are not exclusive, some may overlap, and some may not have universal application. Id.
[25] Query whether the State stored other sealed wiretap recordings properly during this lengthy period of time?
[26] See supra note 11 and accompanying text (recounting prosecution's discontent over the handling of the Box).
[27] The case of State v. DiPrete has come to symbolize pre-trial prosecutorial nonfeasance and/or malfeasance. SeeState v. DiPrete, 668 A.2d 1156 (1996). While the Department's conduct in DiPrete is not necessarily comparable to the present violations, DiPrete and its progeny highlight the importance of the Department's pre-trial diligence. See generally State v.DiPrete, 668 A.2d 1156 (1996); State v. DiPrete, P1-94-1000 A B, 1996 R.I. Super. LEXIS 122 (Jan. 10, 1996); State v.Musumeci, 717 A.2d 56 (1998).